## 3169. WILSON *v.* THE STATE.

1. The defense of insanity was clearly and conclusively established from the indicia presented by the act itself and the evidence of the mental condition of the accused before, at, and after the commission of the alleged criminal act. There was no evidence of any probative value to rebut the convincing proof of mental disease in the accused and that the act was the product of the disease.

2. The only rational inference or hypothesis presented by the evidence in this case is that the accused, at the time of the commission of the crim-

inal act, was suffering from some form of mental disease, and that this disease was the efficient cause of the act. The trial judge, therefore, in addition to the charge that, if a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible, should also have given the jury an instruction (requested in writing) embodying the principle of the exception to this general rule or test of insanity as an excuse for· acts otherwise criminal,· to wit, that a man must have intelligence and capacity enough to form the criminal intent and' purpose; and if his mental faculties are so deficient that he has no will, no conscience or controlling mental power, or if, through. the overwhelming power of mental disease, his intellectual power is for the time obliterated, and this mental disease is the efficient cause of the act, he would not be legally responsible, and the jury should find him not guilty, because of insanity.

3. Testimony totally irrelevant or immaterial, · but which is calculated to arouse prejudice or passion against the accused, should not be admitted in evidence.

DECIDED APRIL 24, 1911.

Indictment for assault with intent to rape; from Cobb superior court—Judge Morris. January 7, 1911.

E. H. Clay, Gober & Griffin, R. R. Arnold, for plaintiff in error. J. P. Brooke, solicitor-general, J. Z. Foster, contra.

HILL, C. J. John Wilson was convicted of an assault with intent to rape, and sentenced to a term of 20 years in the penitentiary. He assigns error on the judgment overruling his motion for a new trial. In addition to the general grounds, an amendment to the motion makes the following assignments of error:

First. The State was allowed to prove that the female assaulted was pregnant at the time. This testimony was objected to, because irrelevant and wholly immaterial, and calculated to arouse the prejudice of the jury.

Second. The court allowed the State to show by one of the medical witnesses the effect of light upon the eyes of an intoxicated person. There was no evidence indicating that the accused was intoxicated at the time of the alleged assault, and it was insisted that this evidence was therefore irrelevant, and suggested to the jury that the assault was the result of a voluntary act of intoxication, which would constitute no defense and was not due to any mental disorder.

Third. Grounds 3 to 20, inclusive, assign error upon the refusal of written requests to give instructions relating to the defense of insanity and the rule or test of legal responsibility for acts otherwise criminal, the presumption· in such cases, and the degree of mental

conviction necessary to convict where the defense is insanity. The trial judge covered substantially all these requests in the general charge, except the one which defined the legal rule or test of sanity. On this point the court charged: "The rule of law that relieves one from criminal responsibility for the commission of an unlawful act on account of mental disease is: If one has reason sufficient to distinguish between right and wrong in relation to the particular act about to be committed, he is criminally responsible." The request on this subject was: "If you find, from the evidence, that the mind of the defendant at the time of the assault was diseased, that by reason of such mental disease his will power was then impaired, that by reason of such impairment, so caused, he did not have sufficient will power to refrain from committing the act, and that the act was the product of such mental disease, he was not responsible for the act, and it would be your duty to acquit him. To be held criminally responsible, a man must have reason enough to be able to judge of the character and consequences of the act committed, and he must not have been overcome by an irresistible impulse arising from disease."

Fourth. Alleged newly discovered evidence. This was contained in the affidavit of a policeman in the town of Marietta that on the morning of the day when the assault was committed he was called to the boarding house where the accused spent the night, for the purpose of removing him from the house; that from his appearance, his conversation, and his manner, the affiant was of the opinion that the accused was then of unsound mind to the extent that he would not know right from wrong.

The evidence relating to the criminal act, and which was not controverted, substantially stated, is as follows: On May 2, 1910, about 7 o'clock in the evening, the accused, himself a stranger, called at the home of Ralph Stephens, the husband of the female who was alleged to have been assaulted, and asked for a night's lodging, stating that he did not want anything to eat, neither supper nor breakfast, but only wanted a place to sleep, for which he offered to pay. Stephens refused the pay, but consented for the accused to remain all night. No one was at the house except the husband and his young wife. The three sat up for about an hour conversing, the accused telling Stephens that he was a Scotchman and was living in Atlanta, but did not like this city as well as he did his home in

Scotland. This was the extent of the conversation disclosed by the evidence. The house had two rooms, with a bed in each. About 8 o'clock Stephens told the accused that he was to sleep in the room in which they had been sitting. His wife had previously retired in the other room. The bed in the room occupied by the husband and wife was against the wall of the room, and the wife slept on the side next to the wall. She testified that about 10 o'clock she felt some one choking her, and, opening her eyes, she recognized the accused, who had his hands on her throat choking her, and was lying lengthwise of her body; that he had on his clothes, and was under the quilt; that he had not raised or interfered with her nightgown; that her struggles and groans aroused her husband, who seized the accused and pulled him from her and off the bed; that she jumped out of the bed at once, dressed, and ran out to the home of a constable who lived near by, aroused him, and sent him to her home to make the arrest; that, overcome by the excitement incident to the occurrence, she did not return home, but fainted, and remained at the house of the constable until the next morning. The accused made no resistance to Stephens, and made no explanation of his conduct, Stephens holding him under arrest until the arrival of the constable, who took charge of him. The constable asked the accused what he was doing in bed with Stephens and his wife, and he denied that he had been in bed with them.

The defense relied upon was insanity, and, in addition to the proof furnished by the circumstances of the alleged criminal act itself, the previous history of the accused was proved. This history shows that the accused was 20 years of age; that he was a member of a good Scotch family living in Glasgow, his father being a lawyer, and that he himself was educated in Glasgow at a technological college, where he was graduated as a draftsman; that while at college he was a hard student and stood well in his studies; that after graduating he worked for several years at his profession, receiving therefor excellent wages; that while at work he received a severe blow on his head from a traveling crane; and that, after his apparent recovery from this injury, a great change appeared in his conduct, as well as in his mental attitude. He lost interest in his work, was sullen and morose, with occasional fits of profound melancholia, was at times incoherent and rambling in his conversation, indulged in peculiar vagaries, charging his mother

with an attempt to poison him by putting "stuff" in his food, and making other similar charges against different members of his family. He finally abandoned all work, and wandered aimlessly around, causing his family great solicitude; and this condition of mind, as indicated by his conduct, conversation, and appearance, seemed to grow worse until September, 1908, when his mother, brother, sister, and brother-in-law decided to come to the United States, and he accompanied them. During the trip across the ocean, and from New York to Atlanta, he had nothing to say to any member of his family, and remained alone, avoiding the society of the members of his family and the company of others. When he reached Atlanta he secured employment with a firm of engineers, as a draftsman, at $60 per month. He worked in Atlanta for a month, and, without cause, abandoned his job and sought another in the same capacity, where he worked for another month, receiving $65. He abandoned this job without cause, and went to a dairy farm in the country, where he worked for three months. He then quit the farm, returned to the city, and secured a position as conductor, for a month, with the Georgia Railway & Electric Company, and, quitting this work, he secured a place with the Virginia Bridge Company as draftsman, at $18 per week. In a short time, without cause, he abandoned this job, left the city, and wandered into Cobb county, where he was employed by Mrs. Gober, the wife of Judge Gober, as a man-of-all-work on her place; his duty being to milk the cows, attend to the horses, look after the yard, and go on errands, and to do such other work as his employer required of him, for which he received $5 per week. He remained at this place for five weeks.

Mrs. Gober, a very intelligent witness, testified, that she saw him almost hourly during the time that he was employed by her; that during the first part of his employment he impressed her as being a man of intelligence and refinement; that he was at all times respectful, polite, and obedient, and willing to do his work; that during the latter part of his employment she discovered a marked change in his appearance and conduct; that this change was especially noticeable on the day before he left her place; that on this day she ordered him to hitch up the horse and buggy and go for her laundry; that he seemed to be worried and perplexed over the order, and said he did not know where to go, although the place was well known to him, as he had been to it twice every week for five weeks

during his employment; that his face was flushed, his eyes had a peculiar glare, he complained of a severe headache, and he was so queer in his appearance and his conduct that she did not send him to the laundry, but went herself; that on that day he seemed not to understand anything she said to him; that he left her without notice and without eating his breakfast; and that from his appearance and conduct, from her close observation of him during the entire time and the great change that had taken place in him during the last of his employment, she was of the opinion that he was not of sound mind on the day before and on the day he left her house, and that she did not think he had sufficient mental capacity to know right from wrong. She was so impressed with his condition and so well satisfied that something was wrong with him that she wrote a letter to his mother in regard to his condition. He left Mrs. Gober's the day before the alleged crime, and subsequently, when she saw him in the justice's court on his preliminary trial, he looked like a sick man, mentally and physically.

The witnesses who testified as to his previous history were his mother, his brother, and his brother-in-law, all of whom were persons of refinement, education, and intelligence. In addition to what has heretofore been stated in this summary of the evidence, his brother-in-law testified concerning his peculiar conduct while in Atlanta; that he seemed to be affected just as he was shortly before leaving Scotland; and that while he was employed by Mrs. Gober, on one occasion about two weeks before the alleged criminal act, he came down to Atlanta to see his family, and they were all struck with his appearance and conduct, which indicated mental disease. All of these witnesses testified that from their experience and observation, in their opinion, his mind was so greatly diseased that he did not have capacity to know right from wrong, and was not responsible for his acts.

The marshal of Marietta testified that he saw the accused just the night before the assault; that he had been sitting on the sidewalk in Marietta for about four or five hours; that about nightfall he went to him and told him that he would have to get off the street; that he replied, "I have no place to go, and in my condition it may be hard for me to get a bed." He said he had money to pay for a bed, but people would not take him in. He did not talk intelligently, but the witness could not form, from this casual con-

versation; any opinion of his mental condition. Witness took him
to a place to sleep. He could have gone to Atlanta on the street-
car, or he could have returned to Mrs. Gober's. The deputy-sheriff
and the constable who had charge of the jail testified that during
the entire time that the accused was in jail, from May until No-
vember, they had never been able to get him to talk intelligently;
that they could not get him to keep his clothes on; that he con-
tinually tore them off and tore them into shreds; and that he
frequently was very noisy, and they could not get him to obey
orders or to do anything they wanted him to do. During his
incarceration a fellow prisoner who was impressed with his mental
unsoundness reported his condition to the jailer.

A physician of 13 years' experience testified that he had known
the accused for four months, and had seen him during that time
almost daily; that he was treating him for a venereal disease, and
that from observation of his appearance, conduct, and conversation,
it was his opinion that the accused was mentally unsound; that his
conduct was variable, at times more intelligent than at others, but
at no time could he give intelligent answers to simple questions, and
the witness believed that his mental condition was so greatly im-
paired that he was not responsible for his acts; that the disease from
which he suffered, and from which he had not recovered, was calcu-
lated to affect the man's mind, and to make him melancholy and
gloomy. Another physician, who made a special examination of the
accused with reference to his mental condition, and who was ex-
amined as an expert, in answer to a hypothetical question covering
the history of the accused and the circumstances of the crime, stated
that in his opinion the defendant was not possessed of sufficient
mental capacity to be able to distinguish right from wrong or know
the consequences of his act.

In rebuttal the State introduced three witnesses, the female
assaulted, her husband, and the officer who made the arrest. The
wife stated, without giving any facts upon which to base her
opinion, that "he talked with just as good sense as anybody." This
witness stated, further, that she did not know her age, how long
she had been married, whether she had been married four or six
months or a year, and did not know in what county she lived. The
husband testified: "From what I saw of him, and the conversation
I had with him, and his conduct at my house before we went to bed,

and as we came to town, in my opinion he was a sane man. He had plenty of sense. He knew right from wrong. It is my opinion that a man who would go to a bed occupied by a man and his wife, knowing that it was occupied by them, is a sane man. That is my opinion." All the conversation that he testified that he had with the accused on both occasions was a statement from the accused as to where he was from and what his trade was. This witness also was uncertain as to what county he himself lived in. The constable stated that from his conversation with the accused the evening of the arrest, when the accused came by his house asking for a place to sleep and he directed him to Stephens, and from the conversation between them on the way to town when he had him under arrest, he thought his mental condition was all right and that he was capable of knowing right from wrong. The conversation which he detailed as the one on which he based this opinion was that the accused asked him for a place to sleep, and that he said he was from Scotland, had worked in Atlanta and made $5 per day when he worked, and, when the witness asked him what he was doing out in Cobb county, if he was looking for a job, he replied that it was none of his business.

We have thus stated fully all the evidence relating to the circumstances of the assault itself, and relating to the mental condition of the accused at the time of the assault, and we will now take up the question raised and decide those which we deem necessary and material, beginning with the question of insanity.

1. Whether an act was caused by a diseased mind is to be determined primarily from the indicia presented by the act itself, and then from the results of an examination of the physical, moral, and mental condition of the accused before, at, and after the act in question. The act itself may be so utterly senseless and abnormal as to furnish satisfactory proof of a diseased mind. Considering the circumstances of the act of the accused in the present case, do they indicate sanity or insanity? Was the act the product of a mind diseased, or was it the product of a mind in its normal, healthy condition? Viewed in the light of human observation and experience, and from the standpoint of common sense, can there be two rational opinions on this subject? That the man was either crazed by liquor or by mental disease would be the spontaneous and positive opinion of every man on reading the circumstances relating to the criminal

act. There is no indication whatever in the evidence that he was under the influence of liquor, and therefore the act itself not only raises a doubt of the man's sanity, but forces a conviction of his insanity. No sober, sane man in the possession of his normal faculties would have done the act which this man did, in the circumstances under which he did it, and in the manner in which he did it. That a man would go unarmed to the bed where a husband and wife were sleeping, crawl over the body of the husband, and attempt to rape the wife by his side, is so senseless and so absurd an act as to furnish the strongest proof of the unsound mental condition of the actor. If he had been in a normal condition of mind, he would have known that he could not possibly have accomplished his purpose, and that in his futile effort to do so he would certainly have been detected and either killed or arrested and punished. If he did not realize these facts, it was because a diseased mind prevented him from realizing them. If he was conscious of these facts, and nevertheless persisted in his purpose, his will must have been overpowered, and he was mastered by an uncontrollable impulse of madness. It is true, as argued by able counsel, that men sometimes, through lust, commit crimes, apparently regardless of consequences; but always in such cases the criminal entertains some hope of gratifying his lust and of escaping detection and punishment. Here, if the accused had any reason, he must have known that there was neither the hope of gratifying his lust nor the chance of escaping detection and punishment. It is profitless to continue this line of argument, the circumstances surrounding the act furnish such strong and conclusive proof of mental derangement.

If the rational consideration of the circumstances connected with the act itself permitted of any doubt on the subject, that doubt would be eliminated by the previous history of this unfortunate man. Each new page in his previous history strongly and convincingly corroborates and confirms the instinctive conclusion formed from a consideration of the insane act itself. It is unnecessary to repeat the facts of that history. They are detailed by witnesses of intelligence and education, with full opportunity to know the facts about which they testify. True, some of these witnesses are relatives of the accused; but their testimony is strongly corroborated by the evidence of intelligent and disinterested persons, who also had full opportunities to observe the

accused and to form an opinion of his mental condition. The facts which they narrate coincide with the facts given by the relatives of the accused, and this evidence, considered as a whole, leads clearly and unmistakably to the one conclusion that the accused was suffering from some form of mental disease, and furnished intelligent premise for the conclusion of all these witnesses that he was not responsible for his act, as his mind was so far dethroned that he did not know right from wrong. This is not a case where insanity begins with the commission of the crime, and ends with the acquittal of the criminal. The facts which indicate insanity in this case, graphically detailed by all the witnesses, existed before the commission of the criminal act. Not only is mental unsoundness clearly shown from the conduct of the man and his previous history, but there is a physical cause proved for mental unsoundness, and also a physical cause shown for the aggravation of this mental unsoundness. That insanity may result from injuries to the head, causing some physical disorganization of the brain, is well established both by observation and medical diagnosis. Stewart on Legal Medicine, 384. That the mental unsoundness may be aggravated by physical disease, such as the testimony shows that this unfortunate man was afflicted with, can not be reasonably questioned.

We think it must be conceded that the mind of the accused, when he committed the act for which he was convicted, was diseased. Was it sufficiently diseased to render him irresponsible for his act? In the eloquent language of Lord Erskine: "Was reason totally driven from her seat, or did distraction sit down upon it, along with her, and hold her trembling upon it, and frighten her from her propriety?" In either event, according to this great lawyer, he was irresponsible; and this accords with the opinion of many learned jurists and students of mental disease. It is not the purpose of the writer of this opinion to enter into any lengthy discussion of the subject of insanity or criminal responsibility. That has been frequently done by the Supreme Court of this State, and never more ably or exhaustively done than by Judge Nisbet in the case of *Roberts* v. *State,* 3 *Ga.* 310. The legal test of criminal responsibility which was there enunciated by the learned jurist, as stated by the Supreme Court in the case of *Flanagan* v. *State,* 103 *Ga.* 619 (30 S. E. 550), has never since been overruled, doubted, or questioned by that court, but has been recognized and approved in all subsequent decisions.

The rule is: "If a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible. An exception to this rule, however, is where a man has reason sufficient to distinguish between right and wrong as to a particular act about to be committed, yet, in consequence of some delusion, the will is overmastered and there is no criminal intent; provided that the act itself is connected with the peculiar delusion under which the prisoner is laboring."

While this general rule announced by Judge Nisbet has been followed by the Supreme Court of this State, and has been cited with approval by many judges and text-writers, yet it has not met with universal acceptance, and has been practically repudiated as a reliable test of criminal responsibility by many judges and by many eminent and learned alienists who have made diseases of the mind a special study. The rule would include within its limitations, as criminals, many of the occupants of the insane asylums of this country. One of the ablest writers on the subject of medical jurisprudence declares: "To persons practically acquainted with the insane mind, it is well known that in every hospital for the insane are patients capable of distinguishing between right and wrong, knowing well enough how to appreciate the nature and legal consequences of their acts, acknowledging the sanctions of religion, and never acting from irresistible impulse, but deliberately and shrewdly." Ray's Medical Jurisprudence, § 43. Indeed, there has been constant and strong conflict between the medical profession and the decisions of the courts on the subject of criminal responsibility; the former insisting that the rule of criminal responsibility should be greatly enlarged to meet the varying forms of mental unsoundness developed by modern conditions of life, and the latter endeavoring to restrict the rule within narrow limitations, and to adhere, in substance at least, to the test laid down by Judge Nisbet in the *Roberts* case. It will be seen that Judge Nisbet, while laying down the general rule, states an exception to the rule. The exception was first laid down by Lord Erskine in the celebrated Hadfield case, and it is called "delusional insanity." The learned jurist does not state that this is the only exception to the general rule. Indeed, his discussion of the question suggests that there may exist other exceptions of a kindred character.

Speaking for myself, after a somewhat close study of the decisions on the question, I am persuaded that the courts can not lay down any inflexible rule on the subject, and that the safer and wiser plan would be not to attempt to do so. The law, in my judgment, should not attempt to measure the degree of insanity which renders a man legally irresponsible for his acts. The question should be left in every case to the solution of the jury, under the facts; and if the facts should show that the accused was not of sound mind at the time he committed the act, but was afflicted with insanity, and such affliction was the efficient cause of the act, and that he would not have done this act but for the affliction, he ought to be acquitted on the ground of insanity. In other words, if the act is the product of a diseased mind, and the power to form the intent and purpose to commit the crime is lacking, whatever may be the form of the mental disease, there is no criminal responsibility. If the criminal act is the offspring or product of mental disease, it can not be the act of the accused. To be criminal, an act presupposes the existence of volition on the part of the actor. In other words, neither delusion, nor knowledge of right and wrong in the abstract, nor knowledge that the act in question is wrong and in violation of law, nor design or cunning in executing the act, nor mental incapacity for transacting business, is a satisfactory test of mental disease. All symptoms and tests of mental disease are matters of fact, to be determined in each case by the jury; and whether the defendant had a mental disease, and whether the act was the product of such disease, are questions of fact to be solved by the jury, without the application of any fixed measure or legal test.

Of course, I am not including in this discussion idiots or lunatics; for the law of no civilized country holds these unfortunates responsible for their acts, either civil or criminal. Our Penal Code expressly declares that an idiot shall not be found guilty or punished for any crime or misdemeanor with which he may be charged, and that a lunatic or person insane without lucid intervals shall not be found guilty of any crime or misdemeanor with which he may be charged, unless it is clearly shown that the act was committed in a lucid interval. Penal Code (1910), §§ 35, 36. The facts of this case strongly indicate that the accused was a lunatic; and, if so, these sections were applicable, and cer-

tainly the act was not committed in a lucid interval. But I am now speaking of that class of the mentally insane where the mind is in a condition of twilight, where it is difficult to tell where day ends and complete darkness begins. I believe, also, that it is in harmony with the humanity of our criminal law that the jury should acquit because of insanity wherever the facts are sufficient to raise a reasonable doubt in their minds that the act in question was the product of mental disease.

I am not unmindful of the repeated decisions of the Supreme Court that all persons are presumed to be of sound mind, and that the burden is upon the accused to rebut this inference of sanity by a preponderance of evidence. *Carter* v. *State,* 56 *Ga.* 463; *Carr* v. *State*, 96 *Ga.* 284 (22 S. E. 570); *Danforth* v. *State*, 75 *Ga.* 614 (58 Am. Rep. 480). This rule is not, however, universally approved, and seems to be inconsistent with the presumption of innocence. The criminal intent is a material allegation of every indictment, and is traversed by the plea of not guilty, which puts in issue the question of criminal intent; and the State, in my opinion, should be required to show its existence beyond a reasonable doubt. The Supreme Court has, however, somewhat mitigated the severity of this rule, and greatly lightened, if not entirely removed, this burden from the accused, by holding that if the jury entertain a doubt on the whole showing, including the question of insanity, they must give the benefit of that doubt to the accused and acquit.

But, whatever may be my individual views on this subject, this court is bound by the decisions of the Supreme Court, both as to the rule or test of criminal responsibility and the burden of proof in such cases. The Penal Code of this State seems to cover both the rule and the presumption. It declares that "a person shall be considered of sound mind who is neither an idiot, a lunatic, nor afflicted with insanity." Penal Code (1910), § 33. This would seem to eliminate all finespun or subtle theories on the subject of insanity or the burden of proof in such cases, by the assertion that all persons shall be considered of sound mind who are not afflicted with insanity, leaving the question in every case to be determined by the jury. In the opinion of this court the defense of insanity in this case was satisfactorily and clearly established by a very large preponderance of the evidence, and, indeed, we think that

the hypothesis that the accused, at the time that he committed the assault, was not a person of sound memory and discretion, is shown to a moral and reasonable certainty and beyond all reasonable doubt.

In support of the hypothesis of sanity there was nothing left in the case except the presumption of law, and this presumption was fully met and overcome by the senseless act itself and the previous history of the accused. There was no evidence, in our opinion, of any probative value in rebuttal of the proof of mental unsoundness. It is true that three witnesses,— the woman assaulted, her husband, and the arresting officer,—testified that in their opinion the accused was of sound mind and capable of distinguishing between right and wrong; but it would be absurd to attach any importance whatever to the opinion of these witnesses on this perplexing subject, two of whom had no knowledge on the most ordinary subjects, and none of whom had more than the most casual opportunity for observation. A woman who did not know her own age, the length of her married life, or the county of her residence, did not have sufficient mental capacity to form an opinion of any probative value on the question of the sanity of another person. And the man, who was doubtful of the county of his residence, may well be placed in the same category; and it can hardly be claimed that the officer, from a short, casual conversation with the prisoner under arrest, could form any opinion that would be of value on the subject of that prisoner's sanity. Even if these witnesses had been possessed of profound intelligence and had had extended opportunities for observation, their opinions would be inadmissible as evidence, unless accompanied by the facts upon which they based their opinions. Here the only facts which are given are brief conversations on the most trifling subjects, subjects upon which a child 10 years of age, or an insane person, unless a raving maniac or a driveling idiot, could intelligently converse.

Insanity is a question of fact, and not of law, and it is the exclusive province of the jury to determine all questions of fact; but this does not mean that juries can arbitrarily disregard the clearest and most convincing proof, and accept, as the truth in the evidence, that which, from every standpoint of reason and human experience, is not entitled to any evidentiary weight or value; and,

if they do so, the ends of justice demand that their verdict should be disregarded. Believing, as we do, from a careful consideration of the evidence in this record, that it furnishes the most convincing proof of mental unsoundness, and finding no fact or circumstance in the case that tends in the slightest degree to rebut this overwhelming and conclusive proof, we feel compelled to set aside the verdict finding that the accused was criminally responsible for his act. In our opinion, there is not the slightest doubt that this unfortunate man is a fit subject for treatment in an insane asylum, and that to .punish him as a. criminal would be an act of inhumanity. In the language of Judge Nisbet in the *Roberts* case (p. 328) : "A crazy or partially deranged person is a mystery. Such a person is so by the visitation of God. The subject of insanity is not responsible—humanity, reason, the law, so adjudges."

2. We could very properly stop here; but, to meet any possible contingency that might arise on a second trial in the discovery of additional evidence illustrating the question of insanity, we think it proper to decide the other questions raised by the record. On the issue of insanity the trial judge confined his instructions to the jury to the general rule or test as laid down by Judge Nisbet in the *Roberts* case. We think that, under the facts of the present case, he should also have given the instruction requested on this subject, which contained in substance the exception to this general rule laid down by the learned jurist. It is true it was not contended that the accused was laboring under any particular insane delusion, which overpowered his will and forced him to commit the act, but the evidence clearly established the fact that the accused was mentally unsound, and it was sufficient in its scope to authorize the jury to infer that he was laboring at the time under some insane delusion which destroyed his will power, or impaired his consciousness of legal and moral responsibility. In the total absence of any rational cause for his senseless and absurd act, the jury could have accepted the theory that the act in question was the product of a diseased mind; in other words, that mental disease, and not criminal intent, was the efficient cause of the act in question. We think that the "right and wrong test" was entirely too narrow and restrictive, under all the facts illustrating the mental condition of the accused, and that the principle of the exception laid down by Judge Nisbet and approved by the Supreme

Court should have been presented for the consideration of the jury. The charge requested was in the following language: "If you find, from the evidence, that the mind of the defendant at the time of the assault was diseased, that by reason of such mental disease his will power was then impaired, that by reason of such impairment so caused he did not then have sufficient will power to refrain from committing the act, and that the act was the product of such mental disease, he was not responsible for the act, and it would be your duty to acquit him." We think this request embodies substantially a true test of criminal responsibility, and if it does not fall within the exact letter of the exception to the general rule made by Judge Nisbet in the *Roberts* case, and emphasized in the *Flanagan* case, supra, it falls clearly within the principle of the exception. In the *Roberts* case the following instruction was approved: "In order to constitute a crime, a man must have intelligence and capacity enough to have a criminal intent and purpose; and if his reason and mental powers are either so deficient that he has no will, no conscience, or controlling mental power, or if, through the overwhelming power of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts."

We see no difference in substance between these instructions, approved by the Supreme Court, and the instruction requested in the present case. An act produced by mental disease is not a crime. If the accused had a mental disease which irresistibly impelled him to assault the woman, the assault being the product of the mental disease in him, he was not responsible. He was innocent, as innocent as if the act had been produced by involuntary intoxication, or by another person using his hand against his utmost resistance. And whether the act in question was produced by partial insanity, and whether it was connected with that insanity which was the efficient cause, were questions for the solution of the jury, and the instructions should have been broad enough to have permitted the jury greater latitude in determining these questions than that which is permitted by the old "right and wrong test" of insanity.

3. The evidence as to the pregnancy of the woman who was assaulted was wholly irrelevant and immaterial. It did not illustrate in any manner the issue of sanity or insanity, or criminal intent. The evidence may have aroused indignation against the

act of the accused. The fact of the assault was sufficient to arouse the passion and indignation of the jury and did not need any extraneous or irrelevant circumstance of aggravation. While the admission of this evidence is not sufficient of itself to cause us to reverse the judgment refusing a new trial, we do not think it should have been admitted.

4. The other assignments of error are not of sufficient importance to justify extended consideration. The objection to the testimony of the medical expert as to the effect of light upon the pupil of the eye when a person is in a state of intoxication is not meritorious, for this testimony seems to be favorable to the defense of insanity. He testified that the pupil of the eye, under normal conditions, will contract in the presence of a bright light, especially in a dark room; that he had tried this test on the accused in a dark cell; that he held a match close to his eye, and the pupil would not contract at all, and that this indicated some trouble with the brain; that when this occurred it always indicated some abnormal condition of the brain. The value of this opinion we will leave to the decision of learned alienists, and will not venture to express any opinion on the subject. We are sure that the evidence did not injuriously affect the accused.

The alleged newly discovered testimony is entirely cumulative in its character, and while it would probably give some additional strength to the theory of the insanity of the accused at the time of the assault, in that it was the expression of an opinion, based upon the facts, of his state of mind a few hours before the assault was perpetrated, yet it would not be of itself sufficient to authorize the grant of another trial. We are content to place our judgment, granting a new trial in the case, on the ground that the defense of insanity was clearly established, and that the verdict finding that the accused was criminally responsible for the assault is without any evidence of probative value to support it, and, further, that in our opinion, under the evidence, the trial judge should not have confined the jury, in considering the question of insanity, to the general "right and wrong test," but, in addition to this general test, should have given in charge the written instruction requested on that subject, which in substance embodied the exception to the general rule as declared in the *Roberts* case.

*Judgment reversed.*