1. This case came to this court only on the general grounds. The verdict of guilty of rape, without a recommendation, was fully supported by the corroborated testimony of the victim, in which she positively identified the defendant, and by his confession, which under the uncontradicted evidence was made without threat or promise of reward.
2. Although the defense of insanity at the time of an alleged crime may be made under a general plea of not guilty (Carr
v. State, 96 Ga. 284, 286, 22 S.E. 570), the burden rests on the accused, under the presumption of sanity, "to show by a preponderance of evidence, but not beyond a reasonable doubt, that at such time he was mentally irresponsible, under the tests recognized in this State." Rozier v. State, 185 Ga. 317, 319 (195 S.E. 172), and cit; Danforth v. State, 75 Ga. 614 (3) (58 Am. R. 480); Griffin v. State, 195 Ga. 368, 375 (24 S.E.2d 399); Bowden v. State, 151 Ga. 336 (3), 339 (106 S.E. 575); Hinson v. State, 152 Ga. 243 (2) (109 S.E. 661).
3. Where, as in this case, the exception of "delusional insanity" is not involved, the sole test of criminal responsibility is whether the accused had "reason sufficient to distinguish between right and wrong in relation" to the particular offense. Roberts v. State, 3 Ga. 310; Rozier v. State, 185 Ga. 320 (supra), and cit.
There was testimony for the defendant that at intervals he would have "spells" and be in a "trance." His father was permitted to testify that at such times he "did not know right from wrong" and "would get in trouble." but that at all other times he was "quiet, peaceful," and "normal." While his father and mother testified that he had "talked out of his head" and "wouldn't eat" on Thursday and Friday before the crime on the following Sunday, and on Saturday he had pulled up a post in the country, where he lived, which ordinarily would have required three men to do, the testimony as to the post indicated merely his physical strength, and did not show anything mentally abnormal in the act itself. The defendant's testimony showed that he was fully able to go about town and return home on Saturday, without any mental abnormality at that time or subsequently. For the State there was positive testimony by witnesses, who knew and had often seen the defendant, to the effect that he was entirely normal. The State's evidence as to his language and conduct on the day of the crime, before and after as well as at the time of its commission, also indicated that he was mentally normal. Accordingly, on the issue of criminal responsibility under the preceding rule, the verdict against the defendant was authorized by the presumption of sanity and the testimony.
Judgment affirmed. All the Justices concur.
 No. 14680. NOVEMBER 10, 1943.
Willie Hubbard was found guilty, without a recommendation to mercy, of rape upon a lady sixty-four years of age, who lived alone *Page 78 
on her farm. According to her testimony, in the late morning on a Sunday, just after she had finished milking her cows, a strange negro man came in her gate, and asked her if he could buy some butter. When she directed him to a colored neighbor, he began a conversation about her saddle horses and other things, and when she told him to go on and see the neighbor, "he turned as if he was going to the gate," and then said he would take "a short cut through the woods" to where he was going, which took him in the direction of her kitchen, where she was going to put up her milk. Before she reached the kitchen, "the milk bucket was knocked out of my hand, and he was to my back and had his hand on my throat, and said, "Don't you scream." After struggles and the wrenching of her arm with unbearable pain which rendered her almost unconscious, and in spite of the efforts of her dogs to help her, he carried her into the kitchen, threw her on the floor, and completed the assault. He then robbed her of all her money in the house, $10. Although she was barely able to stand, she went to her gate in about ten minutes, and saw a neighbor and his wife down the highway waiting for a bus. Other testimony showed that she reported to them what had occurred, and thus corroborated her testimony as to the attack and as to her injuries, which they saw, her arm being badly wrenched, with marks of teeth in a "perfect semi-circle" on her arm where she had been bitten, and a wound on her mouth where she had been struck. Her throat was very sore from the attack. Later in the day after the capture of the defendant, she positively identified him, partly by the peculiarity of his protruding teeth and a discoloration in the white of his eyes.
There was testimony for the State, tracing the movements of the defendant from where he lived, some miles distant from the victim. to its vicinity, and as to false statements that he made on the way there in telling his name and where he lived. The sheriff testified that this defendant, four days after the arrest, without any threat or promise, and after previously denying the charge, said, "I am going to tell you the truth, I was the one that done that;" and told the sheriff and other officers all the details of the crime, as was testified by the victim, as to his robbing her of money, and as to his movements after the crime. A deputy sheriff and a city police officer testified to like effect. The officer swore that the defendant said "he was sorry of it, that he had done it and had done *Page 79 
wrong and he knew he had done wrong," and "the reason he did it that Sunday was because he was drinking."
In his statement to the jury, the defendant did not deny the charge or the testimony for the State, but merely said: "That Sunday morning I went down the road. I had been having spells. It started on me that Thursday." That he had then driven a tractor from a field "back on the rim," and a man told him this would ruin it; that he had "pulled" up a "big post" on his father's place that day; that he went to town, and bought " a half a pint of moonshine whisky . . mixed it with government liquor. That Sunday I drank it, hoping to run the spell off. During that week I was dizzy about the head, look like I was nervous. I went on to work a while. I stopped again, and the spell would strike me again. I would go ahead and I would stop. It kept working on me. I got more liquor and drank it, trying to stop it. It would strike me, and I went and set down. I went to town Saturday. I got more whisky and drank it that Sunday. It kept working on me, running me crazier and crazier. I stayed dizzy in the head. I have been that way since I have been in jail, twice."
As to the defendant's mental condition, a witness who had employed him testified for him, that the defendant had driven a tractor on three wheels with one wheel off on Thursday preceding a crime; that he would not say anything to any one, but appeared to be in a "deep study" without his usual talkativeness, on the following Friday, and he was acting "peculiar" and "not acting normal," would not eat but "a mouthful or two" of the dinner that was offered to him, although he "didn't say he was sick," and only said "he didn't want anything;" that he had eaten "good before that time;" and that on Friday and Saturday "he looked like he was worried about something."
An associate of the defendant in his work and on a trip to town testified, that on another occasion the defendant had driven mules "in a full gallop," and said he "just had them in a giggle trot;" that at another time the defendant had bogged down a plow by taking it through a swamp and branch; that the defendant had driven a tractor, as above testified by another witness, after which "he was talking crazy." This witness also said: "We had run around and drank a little together;" that when the defendant "did not have these spells, he was a good worker, and could do as much *Page 80 
work as two men;" and that "you could run the tractor with one wheel off, but it would put a strain on the other wheels. The tractor had rubber tires on it."
Another witness, who had lived on the same place with the defendant for two years and had known him since he was a boy, testified, that "at times he was awfully cruel with the stock for a while, and then again he was just as mild and kind as he could be with them;" that at times in his work he "would stop all at once and study, and then he would go ahead and work a while;" that two or three days before the crime he had "acted foolish," and "would stop and study and looked like he was worried about something;" that he "would have those spells about once or twice a week;" that "when he was at himself he was a talkative negro;" that on the Saturday preceding the crime, the defendant "had whisky in town that afternoon; he also had another little bottle of white liquor, homemade liquor, I guess;" and that the witness had drunk with him.
The mother of the defendant swore that she had "noticed his mind is affected;" that on some "Saturday morning," which she did not more definitely fix, he had pulled up a post himself where they lived, which he ought not to have done alone; that he had "talked foolish and wouldn't eat," and he said he was not hungry, "I can't eat," and he had not eaten much for "two or three days before this trouble. He said he had spells on him; he said he didn't know what was wrong with him. . . I mean by spells that he did not have good sense, they run him blank and run him crazy. He had had those spells before, and when he would start walking he would keep walking until something hit him, and every time his mind got that way he would get in trouble. I don't know who put the spells on him, but the woman who put them on him, they tell me, is dead. Her name was Miss Emma Nelson. She put those spells on him, they said. . . He was smart when he did not have those spells. . . I saw him on Thursday and Friday before he got in jail on Sunday. He came to the house. He had a spell on him at that time. He would just say a word or two and pass on by me." On cross-examination, she said "he had just one spell a year;" that "he would not talk when he had those spells, he looked like his mind was blank and didn't know what to talk about;" that "he had been having those spells for about seven *Page 81 
years." On redirect examination, she said that she knew his mind was bad.
The father of the defendant testified as to the defendant's pulling up a post at a corner by himself, which "it would ordinarily take three men to pull up;" that he had been having "crazy spells and crazy actions for about seven years, and every time he had one he would get in trouble," but he was "quiet and peaceful" at other times; that "he talked out of his head before he got in jail Sunday;" that he "didn't talk much when he had one of those spells — he would stand around like he was in a deep study, sometimes for eight or ten minutes, with his head down," and would not do this when normal; that the witness did not see the defendant with any whisky on the Saturday before the trouble, and did not smell any on him that day, although he had not been around the defendant much, and the defendant did not stay at the witness's home Saturday night; and that the witness did not see him on Sunday. He further swore, though as he said "not a doctor," that the defendant "did not know right from wrong when he had those spells. He didn't have that much mind to know right from wrong."
In rebuttal by the State, a deputy sheriff testified, that he had known the defendant for seven or eight years, had seen him several times in the chain-gang and around the camp there, and had "never known him to have a spell," or "like he was in a trance;" that he had "never known him to act any way except as a normal negro;" and that if he had been crazy, "I would have noticed it." The sheriff testified, that he had had the defendant in jail six or seven times, sometimes for about two months, and at such times would see the defendant "every day;" that he had "never known him to have any spells of any kind," or to get in a "trance where he couldn't talk;" that the sheriff had "never seen any indication that his mind was feeble or weak or bad in any way," and "never saw anything wrong with his mind;" that the defendant had been on the chain-gang several times, "broke into houses." Another witness, who had worked the defendant on the chain-gang, swore that he had never seen any indication of feeble-mindedness or insanity in any way in the defendant, or "a spell of any kind," or "a trance," that the defendant "was one of the best tractor drivers Bleckley County ever had;" that when the defendant was arrested in the afternoon after the crime, he showed no "evidence of being *Page 82 
in a trance," and "appreciated what was going on around him," and "was not nervous when we told him to throw up his bands."
In the testimony of the lady who was assaulted, in which she related his conversation before the assault, and what he afterwards said to her, there was no indication of any mental abnormality or any failure on his part to know what was done. She testified that there was no whisky on his breath.
Another witness, who saw the defendant in the morning before the defendant reached this lady's home, swore that he "did not see any signs of [the defendant] being in a trance," and "did not see a thing wrong with him," and "did not smell any whisky on his breath." This witness said he had known the defendant five or six years, and had seen him about the camp on the chain-gang: that the witness had "never known him to have a spell," or "to be in a trance;" that "he seemed to know what was going on" at all such times; and the witness had "never heard of him having any spells or anything being wrong with him," and he knew that the defendant's "mind was not bad; if it had been, I would have heard it."