21439.   ROSS v. THE STATE.

ARGUED NOVEMBER 13, 1961—DECIDED FEBRUARY 8, 1962.

*H. G. Rawls, D. C. Campbell, Jr.,* for plaintiff in error.
*Maston O'Neal, Solicitor-General, Eugene Cook, Attorney-General, Rubye G. Jackson, Assistant Attorney-General,* contra.

GRICE, Justice.   The substantial question here, upon review, is whether the evidence is sufficient to support the verdict finding the defendant guilty of murder with a recommendation.

On September 21, 1943, the defendant, Clyde Frederick Ross, was indicted by the grand jury of Dougherty County for the murder of Leopold Crine on April 9, 1943. A special plea of insanity at the time of the trial, as provided by *Code* § 27-1502, resulted in a verdict of insanity by a jury on October 2, 1943, and judgment was entered committing the defendant to Milledgeville State Hospital. He remained there until February 6, 1961, when he was returned to Dougherty County for trial. Upon his trial in April, 1961, the defendant made no issue as to having killed the deceased but defended upon the ground

that he was insane when the homicide was committed. The jury found him guilty with a recommendation and the court sentenced him to life imprisonment. His assignment of error here is on the denial of his motion for new trial on the general grounds only.

1. A preliminary question relates to the state of the record as to restoration of the defendant's sanity from the 1943 verdict of the jury finding him insane at the time of the trial and the subsequent judgment committing him to the Milledgeville State Hospital. This record does not affirmatively reveal any restoration to sanity by any of the procedures provided by law, though restoration is suggested by certain testimony and documents that do appear. We have given this phase of the case careful consideration, including direction to the clerk of the trial court to send up any additional evidence bearing upon such question and invitation to counsel for briefs.

This question was not raised at the 1961 trial and is disavowed by defendant's counsel upon this review. It was not incorporated in the motion for new trial, the grounds of which related only to the sufficiency of the evidence to sustain the verdict of guilty for the crime committed in 1943. In any event, compliance with *Code* § 27-1504 that "No lunatic or person afflicted with insanity shall be tried, or put upon his trial, for any offense, during the time he is afflicted with such lunacy or insanity . . ." is a matter of pretrial for the presiding judge. In this connection, the bill of exceptions, approved as true and correct by the trial judge, recites that on February 6, 1961, the defendant "was released back to the Dougherty County authorities for trial, pursuant to law."

The entire record not negativing such compliance, the presumption is that the public officers of this State, including the Superintendent of the Milledgeville State Hospital and the trial judge, performed the duties incumbent upon them by law, and that the defendant was restored to sanity after being "discharged in the manner prescribed by law" (*Code* § 27-1502; *Richardson v. Hall*, 199 Ga. 602, 604, 34 SE2d 888), before he was put on trial and tried in 1961 for this offense. See *White v. Grimes*, 216 Ga. 335 (116 SE2d 561) ; 22A C.J.S. 352, Criminal Law, § 589 (1).

Therefore, the introduction into evidence upon this 1961 trial of the 1943 verdict of insanity and judgment of commitment of this defendant did not of itself invalidate the verdict of guilty subsequently rendered. The 1943 verdict and judgment became a part of the entire evidence adduced at the 1961 trial, the facts upon which they were based to be rebutted or not rebutted by consideration of all the other evidence in the case. Thus, the only question remaining for our consideration is whether the evidence authorized the verdict finding the defendant guilty of murder with a recommendation.

2. The picture, as drawn by the evidence, has for its background hospital records from Hackley Hospital in Muskegon, Michigan. Those records showed that in 1941 the defendant suffered a brain infection, followed by epileptic seizures, as the result of tongs applied to his head during treatment of a broken neck. There was indication of a distinct personality change after this illness.

The events leading up to the homicide under inquiry here began, according to the defendant's written statement, when he stole a pistol from the Michigan State Troops, of which he was a member, and then bought a regular army cap and a set of master sergeant stripes to use with his Troops uniform so that it appeared to be an army uniform. The defendant thought he would be able to get rides easier if he were dressed like a regular soldier. He left Michigan on March 29, 1943, hitch-hiked to Chicago and from there to San Antonio, Texas. If he could not get a ride at night he would go to the USO and spend the night. He stated that he carried the gun in his suitcase most of the time he was on the road. On April 7th he left San Antonio, on his way to Jacksonville, Florida. About 75 miles east of Pensacola, Mr. Crine gave him a ride. When they were some 12 miles from Albany, Georgia, Mr. Crine's home, the defendant took out his gun and forced Crine to stop the car, get out, and walk some distance out into a wooded area. There, the defendant had the victim give him his wallet. Finding no money in it the defendant handed it back and "when I gave his wallet back to him he stepped forward away from me. When he started to step away from me the gun fired and I realized I had shot him. I do not know how many times I shot him. . ."

The defendant related that he then got in the deceased's car and drove about two miles to a gasoline service station where he bought gasoline. Not having rationing coupons he told the attendant he lived nearby and would bring them to her later. He then drove on through Albany and a few miles north of that city discovered that he was not on the road to Jacksonville so turned around, intending, he said, "to go back out to where I had shot and left [the deceased] and get the gasoline rationing tickets out of his bill folder and come back by the place where I had bought the gas . . . and give her the tickets that I owed her, and also to have more gasoline to get to Jacksonville with."

After he had turned around and headed back toward Albany, "running about 70," the defendant met a State Highway Patrol car. The patrolmen turned around and stopped him. They, not satisfied with the defendant's explanation as to why he, with a Michigan driver's license, was driving an automobile with a Georgia license plate, took him into Albany for further questioning. There, a short time later, he confessed to killing Leopold Crine, the owner of the car, led police to the body, and made a written statement giving the details related here, and others.

Upon the trial the State's evidence consisted of the above referred to written statement of the defendant, given shortly after the homicide, and the testimony of five witnesses, viz., the attendant from the service station where the defendant bought gasoline shortly after the murder, one of the State patrolmen who stopped the defendant and brought him into Albany, a county policeman who took and prepared the defendant's written statement, and was in the group the defendant led to the body of the deceased, the 1943 Albany Chief of Police to whom the defendant confessed, and the solicitor general who also served in that capacity in 1943.

Relying primarily on the presumption of sanity, the State offered no expert testimony on that issue. The only evidence given by the State showing the defendant's mental condition was: (1) that when he bought the gasoline immediately after the murder he "was nervous and kinda like he was in a hurry;" (2) that when he was stopped by the highway patrol he "seemed ner-

vous and very talkative"; (3) that it was the first time the witness (a patrolman) had seen a man who had committed a serious crime just slow up when followed by the highway patrol; (4) that another witness (a county policeman), although stating, "I don't know as I know of a more cold-blooded murder," agreed that he meant assuming that the defendant was sane, and admitted that he didn't know whether the defendant "had a good mind or a bad mind"; (5) that upon the trial of the special plea of insanity in 1943, Dr. Thomas H. Yarbrough, a psychiatrist and later superintendent of Milledgeville State Hospital, and Dr. Keaton, County Physician for Dougherty County, testified that they found no evidence of any insanity, while a doctor from Michigan, one from Albany, and another from Americus had testified for the defendant.

Seeking to overcome the presumption of sanity, the defendant gave evidence by four witnesses, a juror upon the 1943 insanity trial and three physicians, and by Hackley Hospital (Michigan) and Milledgeville State Hospital records relating to his condition.

William Rorer, a juror on the sanity trial of the defendant in 1943, stated that "Two doctors testified and two psychiatrists testified and one doctor testified sane and one insane and one psychiatrist sane and one insane. . ." He recalled that the defendant's father and mother were at that trial and that they showed a change in the defendant's habits after his hospitalization for the broken neck in 1941.

Dr. Russell Thomas, a physician with training and experience in the mental health field and the only medical witness at this trial who had examined the defendant in 1943, stated that from the records of the defendant's Michigan illness and his own examination of him he concluded that the defendant was insane on the date of the homicide.

However, as to whether the defendant could distinguish between right and wrong on the date the homicide was committed, this witness said, "He obviously was having spells when he was blanking out and one time he may know something and at another time he may not. . . It depends on the time of day—whether one of these spells is on him or not." The witness

stated that he considered the defendant to be an epileptic personality and that "they will do things and have no memory of it . . . and if he didn't remember he didn't know right from wrong." The witness then said that in his judgment the defendant did not know right from wrong "at times."

Dr. Thomas agreed that the only point in the defendant's written statement, which would indicate any sort of blackout, was just the brief moment of the gun firing, and that the statement is filled with details except for that one moment. He also agreed that one has to accept that the defendant does remember those things which he said he remembered and which were substantiated by other proof.

Asked whether, if the defendant stated various details as they appear in his written statement, he would say that the defendant remembered them, Dr. Thomas answered, "He must have." Then occurred the following questions and answers: Q. "But you would agree that his accounting of incidents, giving details, which were subsequently proved to be true, were things that he did remember?" A. "I think you'd have to agree to that." Q. "He was not in a blackout when that took place?" A. "Not if he went back and remembered it." Q. "Wouldn't you say that preparation for the act by taking him 400 yards out in the woods . . . [etc.], in order to make it a secretive thing, would show that he knew it was wrong?" A. "Yes."

Some questioning produced the witness's opinion that the defendant was weakminded. Dr. Thomas was asked whether the defendant, in his condition, would be very susceptible to suggestions that events happened, and answered, "I think so . . . I don't believe that boy could remember and build that story. I have never seen that thing before, but I don't believe he could have done that. I don't think he had the mentality to do it and memory." The doctor thought leading questions were probably asked the defendant and that was how the numerous details got into his statement but agreed that the defendant's word as to what he remembered or did not remember would have to be accepted. He stated: "The patient's word is the gospel with us."

The same witness stated that the defendant's actions in driv-

ing the dead man's car through Albany and then turning around and starting to go back through it, knowing it was the home of the deceased, and then stopping for the State Highway Patrol, rather than running from it, was indicative of the defendant's state of sanity since it involved judgment, a vital factor in sanity. In the witness's opinion, these actions, particularly going into Albany in the dead man's car, showed unsound judgment.

Dr. Edwin W. Allen, another physician witness, was with Milledgeville State Hospital in 1958 and first saw the defendant then. He discussed the records on the defendant from that hospital and read the 1943 report of Dr. Yarbrough, in which that psychiatrist made a diagnosis of the defendant's condition as post traumatic psychosis (explained by Dr. Allen as insanity following an injury), and the other Milledgeville staff doctors gave the following opinions: Dr. Bradford, post traumatic psychosis; Dr. Bostick, unclassified; Dr. Mitchell, psychotic; Dr. Clodfelter, unclassified; Dr. Bradley, unclassified; Dr. Cox, unclassified; concensus, unclassified.

The witness also related the records as to the operations performed on the defendant at Milledgeville to remove scar tissue at the site of the tongs which had been placed on his head when he had the broken neck in 1941 and, later, for brain tumor at the same spot. He stated that the defendant's tumor was not completely removed and was still growing, that he will continue to have trouble and require operations to decrease the pressure that the tumor causes on the brain and that his life expectancy is limited. Dr. Allen testified that the defendant operated a State owned store while at Milledgeville and that the records show he was not aggressive, belligerent, or unpleasant while there.

Dr. Allen also discussed the records from the Michigan hospital which showed that the defendant had a convulsion lasting "about three minutes" and gave his opinion that brain cells are damaged in convulsions lasting three minutes or over.

This witness's opinion, based on the records he had studied and what he personally knew about the defendant, was that he was insane on the date of the homicide, "that he had no judgment, would do things without reason, would have convulsions, would

have periods in which he did not remember things and other periods in which he did," and that he had a post traumatic psychosis and epilepsy. He acknowledged that one has to take the patient's word as to whether he remembers things.

Dr. Allen agreed that it was possible for a man to have convulsions and yet know right from wrong during the time he is not having one. He was asked, "If a hitch hiker is riding down the road with a pistol and . . . when he gets to a lonely place . . . he takes his pistol out, orders the man to stop the car, gets out of the car . . . and holds the pistol on the man and marches him across a fence and 400 yards out into the lonely woods for the purpose of robbing him, could you say he was having a convulsion then?" He answered, "No sir, I could not." He also said "he could have had a convulsion. I don't know that he did and I don't know that he didn't," and "a person is not necessarily sane when not having a seizure. You can have a basic psychotic person who can be an epileptic too."

Dr. Allen sought to distinguish between whether the defendant remembered what happened and whether, regardless of memory, he had judgment. He stated, "Although he might remember every minute detail of something and then he still could not have the basic judgment to know right from wrong." He felt that the defendant did not know the difference between right and wrong and that "he did things with absolutely no reason behind them."

The witness gave his opinion that on the date of the homicide the defendant was totally irresponsible, that he had no judgment and stated, "I feel that this man, no matter what happens, must be supervised . . . I personally do not feel that he is dangerous."

Dr. J. F. Cantrell, the third physician, testified that he first saw the defendant only recently and based his opinion upon the records from Michigan and Milledgeville and his recent examination of the defendant. He stated that he did not think the defendant was "sane, totally sane, from the date of his dismissal here [Michigan]." He testified that the defendant showed definite signs of mental aberration from the date of the Michigan dis-

charge, or even before; that according to the records he had a convulsion lasting three minutes on his 20th hospital day and one lasting five minutes on his 24th hospital day, and on the latter day remained in a "convulsive state" for five hours and 45 minutes and that this could damage the brain. Dr. Cantrell's opinion was that the defendant was insane and dangerous from the time he left the Michigan hospital until the crime was committed. He stated that it is not possible to know whether a patient is telling the truth when he tells of a memory lapse.

A study of the evidence is convincing that this defendant suffered from very serious mental disorder. However, mental abnormality is not a defense unless the accused was, at the time of the commission of the offense, mentally irresponsible under the test recognized by law in this State. That test is whether the accused had "reason sufficient to distinguish between right and wrong in relation" to the particular offense committed. *Roberts v. State*, 3 Ga. 310; *Hubbard v. State*, 197 Ga. 77 (28 SE2d 115). The only exception to this is delusional insanity, which is not involved here. Intermittent insanity is no excuse or justification for crime unless the defendant was incapable of knowing right from wrong at the time the act was committed. *Carter v. State*, 2 Ga. App. 254 (58 SE 532). Nor is mere weak-mindedness alone a defense to crime. *Goosby v. State*, 153 Ga. 496 (112 SE 467).

The defense of insanity having been made under the general plea of not guilty, the burden rests upon the defendant, under the presumption of sanity (see *Carter v. State*, 56 Ga. 463, 467), to show by a preponderance of the evidence, but not beyond a reasonable doubt, that he was not mentally responsible at the time of the alleged crime. *Rozier v. State*, 185 Ga. 317 (195 SE 172) ; *Hubbard v. State*, 197 Ga. 77, supra.

Thus, the inquiry for the jury was whether this defendant had reason sufficient to distinguish between right and wrong in relation to this homicide at the time it was committed. The jury having found that he did, and the trial judge having approved that finding, as manifested by his overruling the motion for new trial asserting to the contrary, our only function here is to ascertain if there was *any* evidence to authorize that verdict.

The evidence is persuasive that at times the defendant did not know right from wrong. Yet there was evidence authorizing the jury to find that he did know right from wrong at the time this homicide was committed.

In determining sanity, the jury may consider the actions and mental condition of the accused before and after the crime (*Flanagan v. State,* 103 Ga. 619, 30 SE 550; *Wilson v. State,* 9 Ga. App. 274, 281, 70 SE 1128; 41 C.J.S. 48, 49, Homicide, § 324), and declarations of the defendant made at the time of the offense or reasonably close thereto may be considered as proof of his mental condition at the time of the crime. *Cochran v. State,* 212 Ga. 245 (91 SE2d 601).

Here, the defendant's actions before and after the homicide, as related in his written statement and by witnesses, were such as to authorize the jury to determine that they were those of a sane person. The jury also could have concluded that the defendant's actions in preparing for his travels by stealing a pistol and buying an army cap and insignia to aid in hitch-hiking and to enable him to use USO facilities, leading his benefactor away from the public highway into a wooded area before molesting him, obtaining gasoline on his mere promise to bring the rationing coupons later, driving through Albany in the dead man's car as if nothing had happened, and stopping for the State Highway Patrol, rather than running, were those of a sane and cunning man, not an insane one.

Furthermore, the testimony as to the defendant's mental condition by the witnesses who talked with or observed him on the day of the crime, the service station attendant, a State highway patrolman, a county policeman, and the Albany Chief of Police, indicated, at the most, only that he was nervous and talkative. The jury was authorized to conclude that, under the circumstances, this was normal conduct.

The defendant sought to establish his defense of insanity by expert testimony. The rule as to the inconclusiveness of such testimony is clear. "Opinion testimony of this character is, however, by no means conclusive upon the issue of sanity or insanity, but is peculiarly dependent upon the facts or evidence supporting the testimony rendered. Undeniably, opinions of

qualified witnesses upon the issue of insanity carry substantial weight, yet it is the province of the jury to determine the precise weight to be given it." 26 Am. Jur. 483, Homicide, § 472.

"They [the jury] are not bound to decide the issue of insanity in conformity with the declarations of any number of witnesses which do not produce a conviction in their minds as against the testimony of a lesser number of witnesses, or a presumption, or other evidence satisfying their minds, and thus are not required to find accused insane although a number of witnesses have testified that he was insane and no expert or other witness has testified that he was sane. . ." 41 C.J.S. 47, 49, Homicide, § 324.

Each of the medical witnesses here testified that in his opinion the defendant was insane at the time of the homicide. However, one of them was of the opinion that the defendant knew right from wrong *except* when he was in a spell or seizure. All agreed that he would not remember what he had done while in such condition. Thus, the factor of later recollection by the defendant of his having killed the deceased and of the events immediately preceding and following the killing is of utmost significance in evaluating the medical testimony.

In this connection the testimony of Dr. Thomas was that whether the defendant knew right from wrong depended "on the time of day—whether one of these spells is on him or not" and "Doing things he could remember wasn't a blackout." In response to the question "If he stated . . . [various details as they appear in the defendant's written statement], you would say that he remembered that, wouldn't you," Dr. Thomas replied, "He must have." Then to the question "He was not in a blackout when that [the various events leading up to the homicide, as related in the defendant's written statement] took place," Dr. Thomas answered, "Not if he went back and remembered it." Dr. Thomas further agreed that the secretive manner in which the crime was committed, i.e., taking the deceased out into the woods to kill him, would show that the defendant knew it was wrong.

There is no evidence that the numerous details in the defendant's written statement resulted from leading questions or sug-

gestions as to events, as intimated by Dr. Thomas. On the contrary, the only evidence on this subject showed that such was not the case. Mr. Stokes, the county policeman who typed the statement, was asked, "Where did the details come from that make up this statement?" He replied, "From Mr. Ross."

That some of the medical testimony was to the effect that, aside from temporary seizures or blackouts, the defendant at all times was psychotic and did not know right from wrong, does njot call for a different conclusion. The jury had the right to select the testimony which it considered to be in accord with the defendant's true mental condition.

Those cases relied upon by the defendant, including *Handspike v. State*, 203 Ga. 115 (45 SE2d 662), involved dissimilar situations where the evidence was undisputed that the accused was insane when he committed the offense.

The verdict against the defendant was authorized by the evidence. Accordingly, denial of the motion for new trial on the general grounds was not error.

*Judgment affirmed. All the Justices concur, except Head, P. J., and Quillian, J., who dissent.*

HEAD, Presiding Justice, dissenting. In order to overcome the commandment of our law that no insane person shall be tried or put upon trial for any offense during the time he is insane (*Code* § 27-1504), and the conclusiveness of a valid judgment entered upon a verdict of a jury in the manner provided by law adjudicating the defendant insane in October, 1943, the majority opinion relies upon a presumption that the trial judge performed the duties incumbent upon him by law, and "that the defendant was restored to sanity after being 'discharged in the manner prescribed by law' [*Code* § 27-1502]." The presumption that the trial judge did his duty is met with the presumption that a mental state once proved to exist is presumed to continue. *Code* § 38-118. The statement that he was "discharged in the manner prescribed by law" is met in the first instance by the statement in the opinion that: "This record does not affirmatively reveal any restoration to sanity by any of the procedures provided by law. . ."

By an act of the General Assembly approved March 9, 1956

(Ga. L. 1959, pp. 585, 586-587; *Code Ann. Supp.* § 49-610.9) it is provided in part as follows: "In the event a person who has been committed to Milledgeville State Hospital is released therefrom as being sane, under order of the superintendent, a copy of such order shall be transmitted by the superintendent, within five (5) days of the date of such order, to the ordinary of the county from which such person was committed, and thirty (30) days from the date of the receipt of such copy by the ordinary, such person shall be deemed to have been legally restored to sanity, and it shall be the duty of the ordinary to issue an order to that effect and enter such order on his minutes along with a copy of the order of the superintendent. . ."

Decisions of this court prior to the 1956 act can not be substituted for the positive commandment of the law as enacted by the General Assembly in 1956. Upon failure of the State to show that the defendant had been restored to sanity pursuant to the command of the 1956 act, there could be no valid trial of the defendant on an indictment charging him with the commission of a crime prior to the judgment of the court declaring him insane.

Reference is made in division 2 of the opinion to a presumption of sanity at the time of the commission of the alleged crime. No insane person can be put upon trial during the period of such insanity, and whether the defendant was sane or insane at the time of the offense alleged can not properly be brought into issue where the defendant was adjudged insane in the manner provided by law, and was not thereafter adjudicated to be restored to sanity pursuant to the commandment of the law.

The 1956 statute providing for a judicial adjudication of restoration to sanity not having been complied with, it is my opinion that the purported trial of the defendant was wholly and completely void, and that it should have been so declared by this court.

I am authorized to say that Mr. Justice Quillian concurs in this dissent.