## 56501. SHIRLEY v. THE STATE.

WEBB, Presiding Judge.

Shirley has appealed his conviction for burglary and possession of a firearm during the commission of a crime. His principal contentions are that the court erred in refusing to charge the jury on his defense of insanity and denying his counsel permission to argue that issue to the jury. He also contends that the trial court should have charged § 27-1503.

1. The threshold issue in this case is whether there was any evidence to support a charge on insanity under Criminal Code §§ 26-702 and 26-703. If there is not, then a charge on Code Ann. § 27-1503 never arises. While the evidence here established that Shirley had been "hooked" on drugs and alcohol for some time, there was nothing presented to show that his addiction had destroyed his knowledge of right and wrong, that he could not distinguish between right and wrong, or that he was acting under a delusional compulsion.

2. Remaining enumerations are without merit.

Accordingly, the judgment of conviction is affirmed.

*Judgment affirmed. McMurray, Smith, Shulman, Banke and Birdsong, JJ., concur. Deen, C. J., concurs specially. Quillian, P. J., dissents.*

SUBMITTED SEPTEMBER 6, 1978 — DECIDED FEBRUARY 9, 1979 — REHEARING DENIED MARCH 2, 1979 —

*James B. Hamilton,* for appellant.

*Johnnie L. Caldwell, Jr., District Attorney, J. David Fowler, Paschal A. English, Jr., Assistant District Attorneys,* for appellee.

DEEN, Chief Judge, concurring specially.

This case involves and invokes a hybrid version of "act of God," "act of Satan" and "Act of drunkenness" testimony militating toward societal forgiveness under insanity and delusional compulsion defenses. All three of these could be classified as crutches of excusability in shifting the blame to someone else. These arguments vary little from the popular sociological and psychological debates as to the origin of aggression and violent and destructive traits, that is, either heredity or environment. The proponents of the former theory are adamant that aggression is due to alleged animal ancestral innate latent instincts, while the latter are equally sure that destructive tendencies are learned from others in society. These two arguments are also crutches of shifting the blame.

Presiding Judge Quillian makes a strong scholarly argument that the legislature has modified the "right from wrong" test to include "mental illness." One might cite further that drunkenness has been reclassified as an illness of alcoholism, instead of a wrongful act. Many intellectuals teach today that situation ethics or circumstances determine whether an action is right or wrong. Some say there really is no right or wrong but only "sick or well." My only response is that "one convinced against his will is of the same opinion still."

The "McNaughton Rule" is based on the philosophy that humans have a free will, do not act on innate instincts of the lower order, and are responsible for their acts based on a right and wrong test. I believe this is still the law, but also agree that no evidence was presented that appellant could not distinguish right from wrong, therefore there was no error in the charge.

"The right-wrong test has its roots in England. There, by the first quarter of the eighteenth century, an accused escaped punishment if he could not distinguish 'good and evil,' i.e., if he 'doth not know what he is doing,

no more than . . . a wild beast.' " Durham v. United States, 45 ALR2d 1430, 1439. The latter test was changed in the McNaughton case to the "right-wrong" test still followed in Georgia. ". . . [T]he jurors ought to be told . . . that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes . . ." Durham, supra, p. 1440.

The dissent cites and relies heavily on psychiatrists, Drs. Guttmacher, Weihofen and Zilboorg, in chiding the legal profession's having muddied up and confused psychiatric garbled verbiage stating that the law should follow rather than lead, but to stay at a close and sufficient pace as to "keep in sight of the rest of the procession." Even Judge David L. Bazelon, author of the Durham decision which substantially revised the Federal Insanity Test, acknowledges and states the error of many psychiatric conclusions: "Zilboorg's appraisal can be evaluated now. He was wrong." "Psychiatrists and Adversary Process," by David L. Bazelon, p. 176, Biomedical Ethics and the Law, Humber and Almeder, Plenum Press, New York, 1976. Bazelon states further: "Psychiatry, I suppose, is the ultimate wizardry" and "In view of the inherent lack of certainty in psychiatric (as in other scientific) decisions, we held that the question of adequacy must be weighed on the basis of the 'state of the art.' " Ibid., pp. 173 and 179. Psychiatrists, as lawyers, disagree as to "mental illness."

"A psychiatrist who accepts as his 'patient' a person who does not wish to be his patient, defines him as a 'mentally ill' person, then incarcerates him in an institution, bars his escape from the institution and from the role of mental patient, and proceeds to 'treat' him against his will—such a psychiatrist, I maintain, creates 'mental illness' and 'mental patients.' He does so in exactly the same way as the white man who sailed for Africa, captured the Negro, brought him to America in shackles, and then sold him as if he were an animal, created slavery and slaves." Ibid., p. 169, "Involuntary Mental Hospitalization," Thomas Szasz.

To comprehend the obsession of many experts to eliminate the simple understandable moral or immoral "right-wrong" test from the jury and substitute a more

vague, complex and undefinable "mental illness" obscure of moral or immoral and right-wrong connotation, one must understand the presuppositions and world view of the expert. For example, when attorney C. L. Gaylord of River Falls, Wisconsin, B. A., Wisconsin State University, with LL.B. from Drake University, in the provocative and timely article, "We Dance Around in a Ring," American Bar Association Journal, Nov., 1976, Vol. 62, p. 1467, discusses irresistible impulsive irrational acts of rational people, he quotes Dr. Guttmacher and Professor Weihofen in Psychiatry and the Law, "In truth, each of us is born a savage. The wheel of evolution turns with infinite slowness. The newborn infant comes into the world today precisely the same asocial little animal that he was when he was born to prehistoric man." Dr. Alan F. Guttmacher, who is President of Planned Parenthood Federation of America, is one of the signers of the Humanist Manifesto II, whose moral views are: "Ethics is autonomous and situational" meaning there really is no definite right and wrong, so why have a test of this nature. See Religions of America, pp. 542-544, Leo Rosten, Simon & Schuster, N. Y. (1975). Also compare efforts of many in philosophical science who strive to completely wrest and take away all so-called cases involving technical and science questions and experts from courts of law and place them in a science court. See Proceedings of the Colloquium on the Science Court, Jan. 1977, U. S. Dept. of Commerce, National Science Foundation and American Assoc. for the Advancement of Science.

I trust lay people, non-experts, to best decide among the experts, based on a less complicated right-wrong test of responsibility rather than compounding the problem by substituting a sick-well test of irresponsibility. I would affirm.

QUILLIAN, Presiding Judge, dissenting.

I respectfully dissent from the majority holding. In particular, I cannot agree with the statements that the "threshold issue in this case is whether there was any evidence to support a charge on insanity under Criminal Code §§ 26-702 and 26-703. If there is not, then a charge

on Code Ann. § 27-1503 never arises."

The primary thrust of the defendant's appellate and trial arguments was that the trial court erred "in refusing to charge the jury on the defense of insanity . . . [and] in refusing to charge the jury on Code Section 27-1503 . . . [and] in calling counsel to the Bench and informing counsel for appellant and counsel for co-defendant that they could not argue the defense of insanity to the jury and if they attempted to do so they would be stopped by the Court."

The testimony of the defendant, now 29 years of age, was that on the day preceding the robbery he and his co-defendant had ingested mushroom juice, "diet pills [and] speed." He had "been on drugs" since he was 11 years old, and "alcohol and drugs" since age 17. He had taken "barbiturates, speed, THC, heroin, [and] morphine." He had been "committed to . . . Central State Hospital . . . [for] drugs and alcoholism and . . . psychotherapy . . . [for] almost 10 months." He had been treated at the Spalding County mental health center and placed on medication. Just prior to the burglary, he and his co-defendant — Ms. Hopper, "prayed for a long time . . . [He] thought it was alright . . . to go in there and get clothes . . . because I thought God was going to grant us just a few clothes." Subsequently the defendant testified: "they was [sic] out to get Floyd Shirley, Lucifer was there. Q. Lucifer was there? A. That's right. Q. Who is Lucifer, we [sic] hadn't testified yet, who is that? A. That's Satan, yes sir, he has testified . . ." As argument to the jury was about to commence, the defendant stated aloud: "The devil is here, Lucifer is among us." The court cautioned the defendant that he would be removed if further outbursts occurred.

Defendant's sister confirmed her brother's use of drugs and alcohol and commitment to the Central State Hospital. She testified that "in the last year or two . . . he just doesn't seem sane at all." From the foregoing evidence, we must determine: First — whether the issue of "insanity" was raised — which would require an instruction under either Code Ann. § 26-702 or Code Ann. § 26-703, and secondly, was an instruction required on Code Ann. § 27-1503? I agree with the majority opinion

insofar as they concluded that the issue of insanity was not raised which would require an instruction under Code Ann. §§ 26-702, 26-703 (Ga. L. 1968, pp. 1249, 1270). I disagree with the majority conclusion that an instruction was not required under Code Ann. § 27-1503 (Ga. L. 1977, pp. 1293, 1295).

"Insanity" is a misunderstood, misused, and abused word. From a lawyer's viewpoint, there are two types of insanity — legal and medical. Although they are related they are not the same. From a doctor's viewpoint, psychiatrists and psychologists in particular, they resist using the word "insanity" except in a legal context. Psychiatrists are attempting "to eliminate the word insanity from medical nomenclature." Singer, Insanity and the Law 3. They prefer the terms "mental health" and "mental illness" when referring to psychological problems of their patients. They categorize a patient's mental illness in terms of neuroses, psychoses, organic brain disorders and congenital deficiencies. Weihofen, Mental Disorder as a Criminal Defense 13. However, lawyers and laymen alike have always used the antipodal terms of "sane" and "insane" when describing the mental health of a person.

A person would be considered *medically insane* "if he is mentally ill and is (a) likely to injure himself or others if not hospitalized or (b) incapable of caring for his physical health or safety." Code Ann. §§ 88-506.1, 88-507.1 (Ga. L. 1969, pp. 505, 525, 531).

*Legal insanity* relates only to the *mental responsibility* of a defendant *at the time the crime was committed. Ricks v. State,* 240 Ga. 853, 854 (242 SE2d 604). Legislators and jurists alike have confused the *mental responsibility* of a defendant for a crime — which *is relevant only at the time of the commission of the crime,* with *mental competency* of the defendant to stand trial — which *is to be determined only at the time of the trial.* See *Ricks v. State,* 240 Ga. 853, 854, supra; Code Ann. § 27-1502 (Ga. L. 1977, pp. 1293, 1296).

*Mental competence* also has a double meaning. Mental competence, when used in a criminal law context, relates only to the mental capacity of a defendant to intelligently participate in his trial. Pate v. Robinson, 383

U. S. 375 (86 SC 836, 16 LE2d 815) (1966); Code Ann. § 27-1502; *Crawford v. State,* 240 Ga. 321, 326 (240 SE2d 824); Weihofen, Mental Disorder as a Criminal Defense 9; 21 AmJur2d 144, Crim. Law, § 63. *Mental competence* of a defendant *at the time of trial* has nothing to do with the insanity tests of Code Ann. §§ 26-702 and 26-703. See *Brown v. State,* 215 Ga. 784 (1) (113 SE2d 618).

*Mental competence,* when used in a civil law context, relates to "mental illness" and the capacity of a person to contract, to make a will, or whether a guardian is required. See Code Ann. §§ 49-601, 49-604 (Code § 49-601, as amended through 1964, pp. 499, 657; and Code § 49-604, as amended through Ga. L. 1978, pp. 1531-1534); Code Ann. Ch. 88-5.

Under Georgia law in effect at the time of this incident a person was "mentally ill" if he had "a psychiatric disorder which substantially impair[ed his] mental health." Code Ann. § 88-501 (a) (Ga. L. 1969, pp. 505, 506). Thus, "mental illness" is the rough equivalent of "mentally incompetent." I conclude this because of Code Ann. § 88-501 (a), supra, and under Code Ann. § 27-1502 (a) and (c) if an accused is found "mentally incompetent to stand trial . . . and there is not a substantial probability that the person will attain competency in the forseeable future, the department [of Human Resources] shall report that finding . . . to the committing court and the person, provided that such person meets the criteria for civil commitment, shall thereupon be civilly committed to a State institution pursuant to the provisions of Chapter 88-5 [Mentally Ill] or 88-25 [Mental Retardation], whichever is applicable." Also, Code § 49-601 states that the ordinary "may appoint guardians for persons who are mentally ill, mentally retarded, or mentally incompetent to the extent that they are incapable of managing their estates." Further, Code Ann. § 49-604 (b), states: "In the case of a person for whom another person desires the appointment of a guardian but not an order of hospitalization, upon the filing of a petition under oath that *the person is mentally incompetent, resulting from mental illness* or other causes . . ." the probate court shall take jurisdiction. (Emphasis supplied.) Under Chapter 88-5, referred to in Code Ann. §

27-1502 as the method of treating persons found "mentally incompetent" to stand trial, the superintendant of a state facility may receive as voluntary patients "any person legally adjudged to be incompetent for whom such application is made by his guardian. If found to show evidence of mental illness and to be suitable for treatment . . ." Code Ann. § 88-503.1 (Ga. L. 1969, pp. 505, 517).

Accordingly, under the civil statutes, a person is "mentally ill" if he has "a psychiatric disorder which substantially impair[ed] health," and under the criminal procedure statute if the defendant was found "mentally incompetent" to stand trial he was referred for treatment under the "mentally ill" statute or "mentally retarded" statutes. Thus the law treats the "mentally incompetent" accused as a "mentally ill" person in need of guardian (Code Ann. § 49-604), or hospitalizes him — if dangerous (Code Ann. § 88-506.1). We are all familiar with persons, who because of some mental illness or senility, are mentally incompetent, therefore incapable of entering into a contract or making a will, or are incapable of intelligently participating in their defense when charged with a criminal offense. In fact, where the defendant enters a plea of mental incompetence under Code Ann. § 27-1502 it is considered to be civil in nature. *Bacon v. State,* 222 Ga. 151, 153 (149 SE2d 111); *Williams v. State,* 238 Ga. 298, 304 (232 SE2d 535).

*Legal insanity* is a complete defense for criminal acts committed during such period of insanity. Code Ann. §§ 26-702, 26-703. However, psychiatrists and lawyers disagree as to the correct basis for criminal responsibility. Lawyers assert that an individual has the option to make a choice to obey the law or to disobey the law, that is — he has a "free will." Psychiatrists advance the theory of pre-determined choice of the individual — called "determinism." Guttmacher & Weihofen, Psychiatry and the Law 402; 45 ALR2d 1447, § 2 (a). From this basic disagreement, we advance to the critical discord in the choice of words when formulating a criminal responsibility (insanity) test. Psychiatrists properly complain that the words chosen by lawyers and legislatures for insanity statutes have no basis in

psychiatric theory or fact. Thus, they argue that "[t]he psychiatrist's job is to match the defendant's mental state to the formula and to report his opinion to the jury . . ." Davison, Forensic Psychiatry 3. In other words, the psychiatrist determines the question of a defendant's sanity using psychiatric criteria and then translates it into whatever legal language is required by statute. Dr. Zilboorg, a noted forensic psychiatrist is quoted as saying: "To force a psychiatrist to talk in terms of the ability to distinguish between right and wrong and of legal responsibility is — let us admit it openly and frankly — to force him to violate his Hippocratic Oath . . . to force him to perjure himself for the sake of justice." Guttmacher & Weihofen, Psychiatry and the Law 406.

Professor Weihofen correctly concluded that the word "insanity" "is used by courts and legislators indiscriminately to convey either of two meanings: (1) any type or degree of mental defect or disease, or (2) such a degree of mental defect or disease as to entail legal consequences" such as avoidance of a contract or will, the need for a guardian, civil commitment to a hospital, or denial of criminal responsibility for an illegal act. Weihofen, Mental Disorder as a Criminal Defense 5.

The various "insanity" statutes of the several states affirm the psychiatrists' conclusions. The statutes are more noteworthy for their diversity than their unanimity. (See Weihofen, Mental Disorder as a Criminal Defense, pp. 129-173, for mental responsibility tests of all states.) The greater majority of states have adopted *variations* of the "McNaughton Rule." (He did not know the nature or quality of the act, thus he could not distinguish between right and wrong. Biggs, The Guilty Mind 105). A large number of states have added the "irresistable impulse" test to the McNaughton Rule. (The accused was unable to adhere to the right even though he knew the act was wrong. The so-called "sexual psychopath" and the "kleptomaniac" generally fall within this category.) Professor Weihofen refers to the "delusional compulsion . . . which overmastered his will" test as that "peculiar rule followed in Georgia." Weihofen, Mental Disorder as a Criminal Defense 105. Dr. Guttmacher states that the "delusion defense," a "naively legalistic attempt to devise

an external, objective standard by which to judge the conduct of a mentally disordered person has been the butt of devastating criticism by both medical and legal authorities." Guttmacher and Weihofen, Psychiatry and the Law 417.

In summary, we find that *legal insanity* represents societal forgiveness, for it *is exactly what the legislature says it is,* and only insofar as society is inclined to forgive a criminal act because of a mentally disordered defendant, the insanity statute will be couched in those words.

In Georgia there was thought to be only two types of *legal insanity,* total (Code Ann. § 26-702), and delusional (Code Ann. § 26-703). Under those statutes a person can not be found guilty of a crime if "such person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence . . . [or] such person because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime."

It has also been the practice in Georgia to enter two types of "insanity" pleas. There is a plea of not guilty by reason of insanity which is entered on the merits. See *Durham v. State,* 239 Ga. 697 (1) (238 SE2d 334). There is also a "special plea of insanity." *Spencer v. State,* 236 Ga. 697 (2) (224 SE2d 910). The Supreme Court held that "the issue raised by a special plea of insanity at the time of trial 'is not, whether the defendant can distinguish between right and wrong, but is, whether he is capable at the time of the trial of understanding the nature and object of the proceedings going on against him and rightly comprehends his own condition in reference to such proceedings, and is capable of rendering his attorneys such assistance as a proper defense to the indictment preferred against him demands.' " *Crawford v. State,* 240 Ga. 321, 326 (240 SE2d 824). However, as stated earlier, "insanity" relates only to a defendant's mental responsibility for the offense charged, and not whether he is "mentally incompetent" to stand trial.

A review of prior decisions in Georgia reveals inaccurate and incorrect usage of the word "insanity" as being interchangeable with "psychotic," "psychopathic,"

"incompetent," "dementia," "deranged," "lunatic," "idiocy," and "non compos mentis." See also Code Ann. § 102-103 Lunatic (Code § 102-103); Singer, Insanity and the Law 211-214; Davidson, Forensic Pyschiatry 283; Overholser, The Psychiatrist and the Law 29. The early Roman Law (300-400 A.D.) also used the words "insane," "dementia," "madness," and "lunatic," interchangeably. Biggs, The Guilty Mind 49-50. We have not yet overcome this difficulty.

Psychiatrists take great delight in this confusion of terms by legislators and jurists, and argue that "[t]he law, then, should attempt to follow rather than to lead [psychiatry], although it is also true that it should at least follow at a sufficient distance to be able to keep in sight of the rest of the procession!" Overholser, The Psychiatrist and the Law 7. If judges, legislators, and lawyers would confine usage of the word "insanity" to "mental responsibility" of an accused for the criminal act charged, and "mental competence" — in criminal trials, to the capacity or ability of an accused to participate in his trial, such consistency would remove most of the ambiguity that surrounds the "insanity" defense. See *Crawford v. State,* 240 Ga. 321, 326, supra.

It is significant that the Uniform Code Committee and the American Law Institute both adopted the same test for mental responsibility of an accused for his criminal acts (10 Uniform Laws Annotated 490; American Law Institute, Model Penal Code § 4.01), and mental competence to assist in his trial (10 Uniform Laws Annotated 491; American Law Institute, Model Penal Code § 4.04). These tests reflect enlightened attitudes of our jurists, legal scholars, and medico-legal experts in this area of expertise. I do not subscribe to the "100 year rule," e.g. this is the way we have been doing it for 100 years so it must be right. If the jurists were correct in their first assumption in the McNaughton case of 1843 of accepting psychiatric knowledge of that day in determining criminal responsibility, I am of the opinion that in 1979 psychiatric knowledge has progressed past that known in 1843 and we should again defer to their area of expertise in formulating a legal test for insanity — rather than clinging to a test which has no basis in

psychiatric theory or fact — except that which existed in 1843. See Overholser, The Psychiatrist and the Law 6-7.

Thus, although Georgia's "insanity" tests are set out in Code Ann. §§ 26-702 and 26-703, for "mental responsibility" of a defendant for his criminal acts *at the time of the offense,* and the "mental incompetency" of a defendant to intelligently participate in his defense, *at the time of trial,* is correctly set forth in Code Ann. § 27-1502, Code Ann. § 27-1503, commingled the terms of "insanity" and "mental incompetency" and used them interchangeably.

First, the title to Code Ann. § 27-1503 — "Plea of insanity or *mental incompetency at the time of the trial,"* (Emphasis supplied.) is incorrectly copied from Ga. L. 1977, p. 1295, which states that the correct title is: "Plea of insanity or *mental incompetency at the time of the crime."* (Emphasis supplied.) The body of the Act states that if "an accused shall contend that he was *insane or mentally incompetent* under the law *at the time of the act or acts charged* against him were committed the trial judge shall instruct the jury that, *in case of acquittal on such contention,* the jury shall specify in their verdict that the accused person was acquitted *because of mental incompetency or insanity at the time of the commission of the act."* (Emphasis supplied.)

Has there been a confusion of terms by the legislature? Under Code Ann. § 27-1502, if the jury found the defendant mentally incompetent *at the time of trial,* this would be a basis for a continuance. However, under Code Ann. § 27-1503, if there was a finding of "mental incompetence *at the time of the act"* the jury would acquit the defendant.

The meaning of the term "mental incompetency" as used in Code Ann. § 27-1503 must be determined. Does it carry the same meaning as used in Code Ann. § 27-1502? In interpretation of statutes, the court is required to look diligently "for the intention of the General Assembly, keeping in view at all times, the old law, the evil, and the remedy." Code Ann. § 102-102 (9) (Code § 102-102 (9)). Code Ann. § 27-1503 has been amended several times in recent years. There are interpretive aids with special relevance in the case of amendatory Acts such as this. If

the intent of the legislature is not clear we should "consider records of legislative proceedings . . . Statutes in pari materia will be looked at." 1A Sutherland Statutory Construction 177, § 22.29. In this instance the legislature changed the title from "Acquittal because of insanity; contents of verdict; confinement of prisoner" to "Plea of insanity or mental incompetence at the time of the crime." The body of the statute was changed to delete "acquitted because of mental irresponsibility" to substitute in its place: "acquitted because of mental incompetence."

The fact that the legislature enacted an amendment indicates it "intended to change the original act by creating a new right or withdraw an existing one. Therefore, any material change in the language of the original act is presumed to indicate a change in legal rights." 1A Sutherland Statutory Construction 178, § 22.30. In the instant case, the title and the body of the Act were changed to authorize a new plea and an acquittal if supported by the evidence for "mental incompetency at the time of the crime."

In looking at the preamble to the 1977 Act, the legislature stated its intent and purpose: "An act to amend Chapter 27-15 . . . so as to change the title of said Code Chapter; to provide procedures in criminal trial involving contentions that the defendant was insane or mentally incompetent at the time of the act charged . . . to amend an Act providing that in all criminal trials in the courts of this State *wherein a contention is made on behalf of the accused that he was mentally incompetent at the time the acts charged against him were committed,* the judge shall require the jury to so specify in verdicts of acquittal based on such contention . . ." Ga. L. 1977, pp. 1293-1294 (Emphasis supplied.)

The defendant did contend that he was mentally incompetent at the time of the acts charged. The majority opinion addresses only the issue of "insanity" under Code Ann. §§ 26-702 and 26-703, holding if the evidence did not raise that type of "insanity" there need be no instruction under Code Ann. § 27-1503. This is our point of departure. Code Ann. § 27-1503 deals both with "insanity" and "mental incompetency" *at the time of the act charged* as a basis for acquittal. The majority deals only with

"insanity" and does not reach the issue of whether "mental incompetency" was raised by the evidence. Nor can it be argued that they are the same. If they were the same why would the legislature amend the old Act — which dealt with "insanity" to include a new term — "mental incompetency"? They must be held to have different meanings, else the legislature amended the Act just for the purpose of being redundant, i.e. "Plea of insanity or [insanity]. . . In all criminal trials . . . wherein an accused shall contend that he was insane or [insane] . . . at the time of the act or acts charged . . ." etc. The inclusion of the new basis for acquittal — "mental incompetency" at the time of the act charged is clearly evident of the intent that it is not the same as the old "insanity."

"Other statutes dealing with the same subject as the one being construed — commonly referred to as statutes in pari materia — comprise another form of extrinsic aid deemed relevant as a source from which conclusions as to how a statute should be interpreted and applied . . ." 2A Sutherland Statutory Interpretation 287, § 51.01. Further, "words or clauses may be enlarged or restricted to harmonize with other provisions of an act." Id. 65-66, § 46.07. Both Code sections, 27-1502 and 27-1503 were passed at the same time using identical wording — "mental incompetency." "Mental incompetency" in Code Ann. § 27-1502 is used in the context of "mental illness" of such a nature which would prevent an accused from standing trial — where such mental condition exists at the time of trial. "Mental incompetency" as stated in Code Ann. § 27-1503 must be taken as having the same meaning — except that the legislature changed the time that the mental state must exist to be "at the time of the commission of the crime" and authorized an acquittal for that mental state at that time.

With this background, we turn first to the question of whether the issue of mental responsibility (insanity) as defined by Code Ann. §§ 26-702 and 26-703, was raised by the evidence. I agree with the majority that the evidence did not raise the issue of insanity as stated in those Code sections. *Drewry v. State,* 208 Ga. 239, 241 (65 SE2d 916); *Ross v. State,* 217 Ga. 569, 577 (124 SE2d 280); *Martin v. State,* 223 Ga. 649, 652 (157 SE2d 458); *Reeves v. State,*

234 Ga. 896, 898 (218 SE2d 625); *Williams v. State,* 237 Ga. 399, 400 (228 SE2d 806). In these cases, the use of drugs, alcohol, blacked out condition, inability to remember, and confinement in mental institutions, did not raise the issue of insanity— as defined by Code Ann. §§ 26-702 and 26-703. And, in each and every one of these cases the basis for their holding was that none of the evidence raised the issue of whether the defendant could delineate between right and wrong. That issue is not involved in whether a defendant is "mentally incompetent." *Crawford v. State,* 240 Ga. 321, 326, supra. The issue therein is "competency" or "mental illness" which is "a psychiatric disorder which substantially impairs the person's mental health." Code Ann. § 88-501 (a); Code Ann. § 49-601.

To raise the issue of "competency" or "mental illness" requires a lesser degree of evidence than that required to establish whether a person can distinguish between right and wrong, or committed an act because of a delusional compulsion which overmasters one's will. Testimony of a lay witness would be sufficient. *Smith v. State,* 141 Ga. App. 720, 722 (234 SE2d 385). Particularly where the witness gives the basis for her opinion as observation over the past two years that ". . . he just doesn't seem sane at all." See *Spencer v. State,* 236 Ga. 697, 700 (224 SE2d 910).

I submit that the evidence introduced was sufficient to raise an issue of "mental incompetency" of the defendant at the time of the act charged requiring an instruction under Code Ann. § 27-1503. Cf. *Sanders v. State,* 140 Ga. App. 101 (230 SE2d 20). Furthermore, even if not requested in correct language, it was the defendant's sole defense — as they admitted they did the acts charged, and their defense was based upon their mental condition at the time of the act, and the court was required to charge — with or without a request, where it was supported by "some evidence." *Pippins v. State,* 224 Ga. 462, 465 (162 SE2d 338).