## 57154. MADDOX v. QUEEN.

BIRDSONG, Judge.

Appellant brings this appeal from a jury verdict for the defendant-appellee. Appellant, a four-year-old child, brought this suit b/n/f, her father. The child and her mother who were separated from the father were living with the appellee Queen, the mother's father and child's

grandfather. Queen, on September 29, 1975, started his riding lawnmower for the purpose of cutting the grass. As the grandfather drove the mower into the yard, the child's mother said she would cut the grass while the grandfather ate a meal. After the grandfather had eaten, he returned to the yard to finish the mowing. His daughter stopped the mower's forward motion but with the mower still running. As she stepped off the mower to relinquish the operation to her father, it suddenly moved forward. The grandfather stepped to the side, out of the way of the mower, but his four-year-old grandchild was standing immediately behind him. The· lawnmower ran into her and in the process, severly mangled her right foot. Neither the mother nor the grandfather knew the child was in the yard.

In the pre-trial order, the principle issues of fact to be submitted to the jury were stated to be whether the mother was negligent in the operation of the lawnmower, whether the mother was the agent of the defendant grandfather, whether or not any of the negligence of the mother, if any, could be imputed to the grandfather and whether the child's father could bring this cause of action. The jury returned a verdict for the appellee-defendant. The appellant brings this appeal enumerating numerous errors. *Held:*

The resolution of the threshold issue of whether an unemancipated minor child can sue her grandfather for a negligent tort is dispositive of this case.

Prosser, Law of Torts 496, 497 (3d Ed.), § 72 has the following comment about the Family Purpose Doctrine. "There is obviously an element of unblushing fiction in this manufactured agency; and it has quite often been recognized, without apology, that the doctrine is an instrument of policy, a transparent device intended to place the liability upon the party most easily held responsible."

In the instant case, the injured child lived in the home of her grandfather because, according to the testimony of the grandfather, the natural father had deserted his wife and child. Under such facts, the jury could conclude that the grandfather was in loco parentis to the granddaughter. See generally *Howard v.*

*Randolph,* 134 Ga. 691 (68 SE 586). The grandfather was certainly the head of the household having provided a home for his wife, his daughter, and his grandchild.

To allow the plaintiff to sue under the facts of this case would violate the public policy of this state. As was held generally in *Chastain v. Chastain,* 50 Ga. App. 241 (177 SE 828) and *Bulloch v. Bulloch,* 45 Ga. App. 1 (163 SE 708): To allow an unemancipated child to sue a parent (or head of the household) would be against the public policy of this state. As we read the facts of this case, there is no evidence showing a wilful or malicious wrong or tort committed by a parent. In fact, it is difficult to glean from the evidence, any familial negligence leading to the injuries. In these circumstances to allow an un-emancipated child to sue the head of the household acting in loco parentis would also be against public policy. No case has been brought to our attention which holds that the head of the household may be sued by another member of the household.

We are aware of the holding in the case of *Stapleton v. Stapleton,* 85 Ga. App. 728 (70 SE2d 156). The facts in the *Stapleton* case are distinguishable. In that case, a father sued on behalf of his five-year-old daughter, the *employer of her mother* who furnished to the mother an automobile. The child was in the automobile being driven by her mother on the employer's business when injured. No such analogous factual situation exists in the case sub judice.

The mother in the instant case was cutting the grass not only for her father's benefit, but for the benefit of herself and her daughter who resided in the home of her father. If the mother was in the process of transacting business affairs, i.e., cutting grass, it was for her own benefit and her daughter's benefit as well as for her father's benefit.

To allow a father, who is separated from his wife and child to file a suit against the grandfather who provides a home for the child and her mother based upon the fiction that the child cannot sue the mother but can sue the grandfather based upon imputed negligence from the mother to the grandfather is repugnant to the public policy of this state. Furthermore, we do not believe it to be expedient or proper to expand further the family car

doctrine. While we are aware that the family car doctrine was extended to a boat by the legislature, Code Ann. § 105-108.1 (b), we will not judicially extend the doctrine to riding lawnmowers.

Appellant moved for a directed verdict on the question of agency on the grounds that there was no question of fact to be submitted to the jury. Additionally, appellant enumerates as error various portions of the charge to the jury dealing with the matter of agency, respondeat superior, negligence, direct and imputable, accident, contributory negligence, proximate cause, and similar doctrines of law. In view of the holding of this court that a suit of the sort here under consideration violates the public policy of this state, these enumerations have all been rendered moot. The decision of the jury being for the defendant for whatever reason is correct.

*Judgment affirmed. Underwood, J., concurs. Deen, C. J., concurs specially. McMurray, P. J., and Banke, J., concur in the judgment only. Quillian, P. J., Smith and Carley, JJ., dissent. Shulman, J., not participating.*

ARGUED JANUARY 16, 1979 — DECIDED JUNE 22, 1979 —

*Harrison & Roper, Gary D. Stokes, D. Landrum Harrison,* for appellant.
*Richard P. Schultz,* for appellee.

DEEN, Chief Judge, concurring specially.

A wife may not sue her husband on a direct cause of action personal to herself, *Heyman v. Heyman,* 19 Ga. App. 634 (92 SE 25); neither can she bring a derivative cause of action for the death of their five-year-old unemancipated child, *Chastain v. Chastain,* 50 Ga. App. 241 (177 SE 828). An unemancipated child under the control and maintenance of the father (Code §§ 74-104, 74-105, as amended, and head of the household or family, Code § 53-501) does not have a cause of action against the father because it would be repugnant to public policy. *Bulloch v. Bulloch,* 45 Ga. App. 1 (163 SE 708). Nor can the unemancipated child sue either parent of the

marriage, mother or father. *Eschen v. Roney,* 127 Ga. App. 719 (194 SE2d 589) relying on *Shell v. Watts,* 125 Ga. App. 542 (188 SE2d 269). The latter was reversed on other grounds in *Shell v. Watts,* 229 Ga. 474 (192 SE2d 265). This parental immunity, however, is forfeited if a wilful tort is committed on the unemancipated child. *Wright v. Wright,* 85 Ga. App. 721 (70 SE2d 152). Likewise an unemancipated child may through the father sue the mother's employer even though the child's mother was the negligent driver of the employer's vehicle. *Stapleton v. Stapleton,* 85 Ga. App. 728 (70 SE2d 156).

An emancipated child may sue a parent for a personal tort founded on negligence (*Farrar v. Farrar,* 41 Ga. App. 120 (152 SE 278)), but emancipated children may not sue their father in a wrongful death action seeking recovery for the mother's death because the action would have been derivative from the mother who had she lived could not have sued her husband for the injury sustained. *Harrell v. Gardner,* 115 Ga. App. 171 (154 SE2d 265), this writer dissenting. Emancipated children likewise may not sue their stepfather who had shot and killed the children's mother and himself, based on similar derivative rationale of *Gardner,* supra, although this writer, author of the majority opinion, agrees with the first paragraph of the dissent in this 5-4 decision wherein Judge, now Justice, Jordan said: "If this court's decision in *Harrell v. Gardner, . . .* cited in the majority opinion, requires the result reached here then in my opinion it should be re-examined." *Horton v. Brown,* 117 Ga. App. 47, 53 (159 SE2d 489).

"As one cannot do indirectly what the law does not allow to be done directly, a third-party action cannot be maintained by a defendant when sued by a minor son as against his mother on account of negligent acts of another child imputed to her by means of the operation of a family purpose vehicle." *Eschen v. Roney,* 127 Ga. App. 719, supra, this writer dissenting. In his majority opinion and while "On Motion for Rehearing" one of Georgia's great judges, Judge Sol Clark, focused on three points: (1) Adherence to stare decisis, (2) immunity for protection of the doctrine of intra-familial harmony, unity and tranquility, and (3) non-indulgence of "judicial

legislation." I thought my answer, at the time, to his first point was adequate citing *Ellison v. Ga. R. & Banking Co.,* 87 Ga. 691, 696 (13 SE 809, 810), *Humthlett v. Reeves,* 211 Ga. 210, 215 (85 SE2d 25, 30), and under *Hall v. Hopper,* 234 Ga. 625, 632 (216 SE2d 839), I believe that ". . . stability must give way to justice . . ." might now be added. As to Judge Clark's third point that Georgia courts should not or do not indulge in judicial legislation or sociological jurisprudence, I concur wholeheartedly. Oxford Professor Ronald Dworkin is today's leading exponent stressing that judicial decisions in hard cases must be based on legal "principles" within the ethical considerations existing at the time of adoption of the guarantees protecting our rights in the Constitution based on higher or immutable law. H. L. A. Hart, on the contrary, urges utilization of utilitarianism and positivism of "policy" which results in judicial legislation of current humanistic ethical sociological and environmental and social change type jurisprudence. Ga. Law Review, September 1977, Vol. 11, No. 5, Jurisprudence Symposium. Judge Clark's second point of prime concern is to preserve the peace, love and unity of the basic family household concept by preventing suits between members of a family. This is a well established principle and should be maintained inviolate as the public policy of Georgia, not necessarily because of Judge Clark's stated reason of stare decisis, but because of ethical "principles" surrounding protection of fundamental privacy rights of people that comprise the basic family household concept. "This law, however, operates directly on an intimate relation of *husband* and *wife* . . ." and it was further said: "We deal with a right of privacy older than the Bill of Rights . . . Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." Griswold v. Connecticut, 381 U. S. 479, 486 (85 SC 1678, 14 LE2d 510) (1965). Speaking of the immediate product and progeny evolving out of conception within the household, the unemancipated child, the court states: ". . . Those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Pierce v. Society of Sisters, 268 U. S. 510,

535 (45 SC 571, 69 LE 1070) (1925). Meyer v. Nebraska, 262 U. S. 390 (43 SC 625, 67 LE 1042) (1923). The rights of those within the above family household for privacy, peace and tranquility from lawsuits from each other appear to be within the penumbras and emanations of the 1st, 3rd, 4th, 5th and 9th Amendments. Yet, the due process rights of another, enabling one to seek a remedy and sue, for an injury, are no less precious constitutional rights.

It appears an unemancipated child may sue his mother's employer, but an emancipated child cannot sue a stepfather for the wrongful death of his mother. If an emancipated child cannot sue a stepfather how stands litigation by an unemancipated child, as here, against one's grandfather? First, what constitutes a family? "A collective body of persons, consisting of parents or children, or other relatives . . . residing together in one house or upon the same premises; a collective body of persons, who form *one household,* under one *head and one domestic government, and who have reciprocal natural and moral duties to support and care for each other . . ."* 35 CJS, 938, Family. (Emphasis supplied.) Consider also 81 ALR2d 1156, § 1: "Whereas in the field of parent-child and husband-wife relationships there has been a tradition, in the American courts at least, to deny the right of such parties to sue each other in tort — although the recent trend has been to liberalize this rule — the arguments advanced in favor of precluding the maintenance of such actions between such closely related parties have never found acceptance where the relationship involved was that of sibling, ancestor, or other collateral relative." The line or circle must be drawn somewhere as to the immediate family.

There seem to be distinctions as to what may be referred to as family or group concept: (1) The basic fundamental husband-male head of household, wife-female unemancipated child concept, the peace and tranquility of which is protected by public policy is the immediate family unit household because no institution is more deeply rooted in our history and heritage than this defined family unit. (2) The general nuclear family includes (1) above and others. "The tradition of uncles,

aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." Moore v. City of East Cleveland, 431 U. S. 494 (97 SC 1932, 52 LE2d 531) (1977). (3) An extra-nuclear self-acknowledged and professed family and group of many unrelated individuals of either sex living in one household. This type group household did not qualify as a defined "family" in the zoning case of Village of Belle Terre v. Boraas, 416 U. S. 1 (94 SC 1536, 39 LE2d 797) (1974).

The individuals within the concepts of (2) and (3) not designated in (1) would not be protected in my opinion by public policy from suit among other members within that household. *Gardner, Brown* and *Roney* all appear to me to be in conflict with the holding in *Stapleton.* I would agree to overrule the first three cases to conform with *Stapleton* so that emancipated children who have evolved out of the (1) basic family household could sue, as could the stepfather and grandfather be sued, since they are in the (2) and (3) categories concept of household group or family. These three cases are all whole court cases and if not overruled must be followed rather than the three-judge case of *Stapleton.*

Further confusing and compounding the issues at bar is the enactment of the conference committee substitute to Senate Bill 18 in the 1979 General Assembly and now signed by the Governor. This legislation substantially changes the marital duties of support between husband and wife partners, both as to support during and upon dissolution of marriage, of each other and unemancipated children. The husband, as head of the household, under Code Ann § 53-501, was left intact, yet responsibilities within the ongoing marriage of the basic (1) family unit household has been greatly altered, although this change was not necessarily required by Orr v. Orr, — U. S. — (99 SC 1102, 59 LE2d 306) (1979). The man-husband/woman-wife parties in a marriage cannot sue each other in tort because there is no one to sue since "... her legal civil existence is merged in the husband," and this merger appears to be an immovable object protected and preserved by both public policy and Code Ann. §

53-501, unless the law otherwise recognizes her separately. The recent case of Orr v. Orr, supra, mandated gender neutralizing of divorce and alimony laws which referred only to "husband" or "wife" as to who must pay alimony upon dissolution of the marriage. It is interesting to note that the General Assembly instead of gender neutralizing used gender neuterizing leaving no reference to the words "husband" or "wife" in the amended legislation but included and substituted the words "persons" or "spouses." Pretermitting whether this could by implication repeal definitions of persons able to contract and enter into a marriage as now adopted by Colorado, or a concomitant gender neuterizing thereof, as was done to persons involved in the dissolving of a marriage, as long as *Gardner,* and its progeny are still the law I am constrained to say that the grandparent cannot be sued as could the stepfather not be sued.

Justice Conley Ingram has stated in his dissent in *Friedman v. Friedman,* 233 Ga. 254, 260 (210 SE2d 754), "To the majority decision which sweeps aside the important public interest in marriage and divorce which has always been embodied in our law" and Justice Ingram later said in *Blois v. Blois,* 234 Ga. 475, 478 (216 SE2d 281), "If we are going to travel this new expressway to divorce, where the state no longer takes an interest in marriages and does not 'hinder facility in the procurement of divorces,' I firmly believe it would be best for the General Assembly to strike all the fault concept grounds of divorce from the law and completely overhaul the divorce and alimony statutes to bring them in line with the new concept. This would seem to me a much better alternative than the painful and hodgepodge attrition and sub silentio repeal of the existing case and statute law covering the fault grounds. There is no dearth of model laws which could be used as a guide for legislative action. For example, the Uniform Marriage and Divorce Act is available with commentary and is useful in considering this problem."

House Bill No. 1031, which is now pending in the General Assembly, could radically eliminate right-wrong from the family household concept and, if the proposal is adopted would strike all grounds of divorce except the

no-fault irretrievably broken ground. This would place the institution of marriage, and the divorce laws in the same liberal trend as no-fault insurance, no-fault alcoholism, no-fault effort in redefining the test for insanity, see *Shirley v. State,* 149 Ga. App. 194 (253 SE2d 787), no-fault and no right or wrong answers within the current dominant values clarification and situation ethics taught in public schools and universities, and no-fault relativistic rehabilitation in prison systems. All of these trends erode absolutes undergirding the law and ultimately lead to a society based on total permissiveness[1] of no right and no wrong and will eventually change the public policy to allow those within the basic family unit, assuming this concept survives,[2] to sue each other. This trend itself is a form of positivism or sociological jurisprudence based on utilitarianism of "policy" rather than "principle." This was the legisprudence "policy"

---

[1]Note GBI Director Tom McGreevy quotation appearing in The Atlanta Journal, Tuesday, December 26, 1978, as to no-fault permissiveness: "End of 'Do your own thing' called key to drop in crime."

[2]The Utopian model depicted in Brave New World for young students as the prospective family concept of values for the future is generally required outside reading along with Lord of the Flies and The Hobbit in "Modern British Literature" and "20th Century English" in many 11th grade public schools. Normal Utopian future family life is portrayed as one of free love, dope, soma and hypnopaedia drugs only three or four generations away for all. Huxley suggests to students:
"Hug me till you drug me, honey;
Kiss me till I'm in a coma;
Hug me, honey, snuggly bunny;
Love's as good as soma."
It is suggested in Utopia that marriage licenses will be, for the future family, issued like dog licenses, — good for 12 months only. There will be no law against changing dogs or keeping more than one animal at a time. pp. xiii, 112. Brave New World by Aldous Huxley, Perennial Classic, Harper & Row Publishers Inc., New York, N. Y. 1946.

judicial philosophy of Justice Oliver Wendell Holmes when he said, "whatever the crowd wants" rather than that espoused by Ulpian's jurisprudence based on principle of "just or unjust." It would appear to be the better rule to the writer to retain fault/no fault concepts within the present basic family unit and concept of marriage and divorce laws as would restitutional retribution appear to retain right/wrong concepts in prison and penal punishment rather than use of relativistic rehabilitation, yet these are matters that must first be addressed by the General Assembly.

We must affirm this case unless the three above-mentioned cases are reversed; therefore I concur specially.

QUILLIAN, Presiding Judge, dissenting.

I respectfully dissent from the majority holding. The majority found the preeminent issue to be "whether an unemancipated minor child can sue her grandfather for a negligent tort." They concluded the grandfather "was certainly the head of the household" and "in loco parentis to the granddaughter" and to allow a granddaughter to sue her grandfather under the facts of this case "would violate the public policy of this state."

I must dissent for two reasons. First, I do not agree that the evidence of record established the grandfather was "in loco parentis to the granddaughter." Secondly, under the facts of this case I find no legal restraint upon the granddaughter bringing this action against her grandfather.

1. "The term 'in loco parentis' means in the place of a parent, and a 'person in loco parentis' may be defined as one who has assumed the status and obligations of a parent without a formal adoption." 67A CJS 548, Parent & Child, § 153. "Grandparents, as such, do not stand in loco parentis. And a grandfather may assume the care and custody of his grandchild under circumstances entirely consistent with the continued existence of the natural relationship between father and child and without any intention to sever that relationship." 59 AmJur2d 190, Parent & Child, § 92. "The relationship of in loco parentis is established *only when the person intends* to assume

toward the child the status of a parent." (Emphasis supplied.) 59 AmJur2d 185, Parent & Child, § 88; State ex rel. Gilroy v. Superior Court for King County, 37 Wash. 2d 926 (226 P2d 882). "The assumption of the parental relationship is largely a question of intention, which, it has been said, should not be lightly or hastily inferred [Rutkowski v. Wasko, 286 App. Div. 327 (143 NYS2d 1)]... [and] its existence is normally a factual question, to be determined on the trial." 59 AmJur2d 185, Parent & Child, § 88; Dodd v. United States, 76 FSupp. 991 (Ark. 1948).

Georgia cases on establishment of this relationship usually deal only with the particular factual predicate in that case. See *Eaves v. Fears,* 131 Ga. 820 (64 SE 269); *Howard v. Randolph,* 134 Ga. 691 (68 SE 586); *Hicks v. Williams,* 135 Ga. 433 (69 SE 547). They provide little guidance. *Howard,* 691 (2) supra, cited by the majority for establishing the relationship of "in loco parentis," holds: "Where a person assumes the relation of a parent to a child not of kin, which he takes from an orphanage at the tender age of three years, and faithfully discharges the duties of that relation by receiving such child into his family and educating and supporting her as if she had been his own child ... stood in loco parentis ..." Even our own court fares little better. In *City of Albany v. Lindsey,* 11 Ga. App. 573, 575 (75 SE 911), we held that "one *who accepts the gift of a child* and, in pursuance of the gift, *performs all the parental duties,* towards it, stands in loco parentis to the child." (Emphasis supplied.)

From a review of all authorities it is established that the relationship of "in loco parentis" is firm and fixed and of continuing character — that of parental rights and obligations to the minor child. It is not a relationship that can be transferred from one to another on a day to day basis. The crucial criterion of the parent is that of "intent," and it is to be determined in a jury trial. See generally 59 AmJur2d 185, Parent & Child, § 88. Before a parent can be deprived of his or her inherent parental right over the child (Code Ann. § 74-108 (Code § 74-108)), there should be "a clear, definite, and certain voluntary contract releasing her right to the child to a third person..." *(Durden v. Johnson,* 194 Ga. 689 (22 SE2d 514)) and "a

clear and strong case must be made, and the terms of the contract, to have the effect of depriving him of his control, should be clear, definite, and unambiguous. *Miller v. Wallace,* 76 Ga. 479 (2 Am. St. R. 48); *Looney v. Martin,* 123 Ga. 209 (51 SE 304);*Beavers v. Williams,* 199 Ga. 113, 124 (33 SE2d 343)." *Waldrup v. Crane,* 203 Ga. 388, 390 (46 SE2d 919); *Fleming v. Reeves,* 243 Ga. 411, 412 (254 SE2d 362); *Hilliard v. Hilliard,* 243 Ga. 424 (254 SE2d 372). The issue of "in loco parentis" was never raised or discussed at the trial of the instant case. What can be gleaned from the record is found mostly in the stipulated facts of the Consolidated Pre-Trial Order, which states: "Plaintiff and Nena Kaye Maddox had been living with defendant since January 29, 1975 at the 7085 Bankhead Highway address. Nena Kaye Maddox was temporarily separated from Wilbur F. Maddox, the Next Friend of plaintiff and her natural father . . . Defendant and Mrs. Queen now reside at a different address, but plaintiff, Michele Kaye Maddox and Nena Kaye Maddox are still living at the Bankhead Highway address. At the time of the accident, Nena Kaye Maddox had been employed with the Georgia State Patrol Office in Atlanta, Georgia, and had been so employed since April or May 1975."

The father is now exercising parental control and his right to bring this action. The mother was then exercising parental control, working, and apparently supporting herself and her child. Ownership of the house is uncertain. The grandfather has moved out and the daughter and granddaughter now live there. There is no evidence of relinquishment of any parental authority by the father or mother to the defendant. There is no evidence of the assumption of any parental right or supervision by the defendant. There is no evidence relating to custody or control of the minor. There is no evidence of the *intent* of the defendant to assume the position of "in loco parentis," or *intent* of the father to relinquish it. If the issue of liability is to rest on this determination, it should be litigated and determined by the jury, and not assumed by this court from the one fact that the child lived in the same household as her grandfather. I find a lack of evidence to support the conclusion of the majority that the grandfather was "in loco parentis" to the granddaughter.

The question of whether insurance should be considered is universally condemned. See 59 AmJur2d 255, Parent & Child, § 156; however, where the majority decision is bottomed on "public policy," as a policy matter — we should consider the effect of the majority decision on insurance coverage by grandparents for their negligent acts. Under the majority rule, grandparents are not legally liable for their negligent acts against their grandchildren who live with them. Thus, even if they have insurance to cover their negligence — as in the instant case, insurance companies are no longer liable to care for the injured grandchildren because there is no liability on the part of the grandparent. This is important for one reason. "The rule of parental immunity from tort liability has been held not to apply where the reason for the rule fails . . ." 67A CJS 508, Parent & Child, § 129 (b). Thus, "the presence of insurance is a factor in minimizing the danger of disrupting family harmony" which is the basis for the "public policy" rule of this state. 81 ALR2d 1163, § 3.

2. The majority found that it would violate public policy of this state to permit a granddaughter to sue her grandfather "under the facts of this case." The reasoning and logic of the majority is persuasive. But as in all legal actions involving intrafamilial plaintiffs and defendants two decisions must be made. The first is the moral decision of whether one should sue a member of the immediate family. The second is the legal obligation of immediate family members to one another. I contend that the moral decision of whether a person is to sue a member of his immediate family is personal — not legal. This court has made the moral decision for all persons in this state. I find no legal basis for this personal decision.

Neither is there a legal bar to bringing this action, under the facts of this case. The right of members of the immediate family to sue one another has always been surrounded by controversy. "At common law, there was no rule of immunity between parents and children for their torts. When the doctrine of immunity originated, it was based entirely on public policy views of the courts . . ." 67A CJS 505, Parent & Child, § 127. Neither is there a statutory prohibition in this state for this type of action.

The general rule is that suits for negligent torts are forbidden between husband and wife, and children and parents. "The doctrine of family immunity extends only to the spouse and an unemancipated minor child." *Howard Concrete Pipe Co. v. Cohen,* 139 Ga. App. 491, 493 (229 SE2d 8). The holding of the majority extends the intrafamilial immunity doctrine to a grandfather. The courts of this nation are going in the other direction. The modern trend is to restrict the doctrine. See Annot. 19 ALR2d 425, 427 and cases cited therein; 59 AmJur2d 253, Parent & Child, § 151. Recent cases have liberalized the right of family members to sue other family members. *Wright v. Wright,* 85 Ga. App. 721, 724-725 (70 SE2d 152); Annot. 81 ALR2d 1156, § 1. The present status may be summed up as: "Whereas in the field of parent-child and husband-wife relationships there has been a tradition, in the American courts at least, to deny the right of such parties to sue each other in tort — although the recent trend has been to liberalize this rule — the arguments advanced in favor of precluding the maintenance of such actions between such closely related parties have never found acceptance where the relationship involved was that of sibling, ancestor, or other collateral relative." 81 ALR2d 1156, § 1. The majority decision extends intra-family immunity to an ancestor — a grandfather. "Some jurisdictions have judicially abolished the parental immunity rule. [See Gibson v. Gibson, 92 Cal. Rptr. 288 (479 P2d 648)]. Others not previously committed have rejected it. At least two have abrogated it prospectively in [certain] situations . . ." 59 AmJur2d 253, Parent & Child, § 152. In Spaulding v. Mineah, 239 App. Div. 460, 268 NYS 772, affd. mem. op. 264 NY 589 (191 NE 578), a verdict in favor of a two and one-half year old child against its grandmother for negligent operation of a car was sustained where the child was sitting in the lap of his mother, who was supervising the driving of the grandmother, who only had a learner's permit. Accordingly, I conclude that the relationship of granddaughter and grandfather does not bar this action.

3. Because I would reverse the judgment of the trial court and permit this action, I must next consider the

issue of whether the fact that the negligent tort was inflicted by the mother of the child would bar the action. I find that it does not. The negligence of parent cannot be imputed to the child. *Walden v. Coleman,* 217 Ga. 599, 603 (124 SE2d 265). Thus, the negligence of a parent would not prevent an action by the child against a third party.

In *Stapleton v. Stapleton,* 85 Ga. App. 728, 732 (70 SE2d 156), this court sanctioned an action by a father on behalf of an unemancipated child, against the employer of the child's mother, who injured her child while driving a company furnished car on company business. In holding that the immunity of the parent from liability for injury to her unemancipated child, due to negligence of the parent, would not extend to the parent's employer, we reasoned that an employer was responsible for the torts of his employee under the doctrine of respondeat superior. Id. at 730. Accord, Chase v. New Haven &c. Corp., 111 Conn. 377 (150 A 107); Mi-Lady Cleaners v. McDaniel, 235 Ala. 469 (179 S 908); see also Annots. 68 ALR 1500, 116 ALR 650. Accordingly, it is the law of this state that where the negligence of the parent is the cause of the injury, this will not bar the action of the child.

4. This leaves only the issue of liability of the grandfather for the negligent torts of his daughter. It is axiomatic that a principal is held liable for the torts of his agent, acting within the scope of his authority and the prosecution of the business of the principal *(Verddier v. Neal Blun Co.,* 128 Ga. App. 321, 322 (196 SE2d 469); Code Ann. §§ 105-108, 4-311 (Code §§ 105-108, 4-311)), and every person is liable for "torts committed by his wife, his child, or his servant, by his command or in the prosecution and within the scope of his business . . ." Code Ann. § 105-108. (Code § 105-108).

" 'A child, whether minor or adult, may occupy the position of a servant or agent of his parent, and for his (or her) acts as such the parent may be liable under the general principles governing the relation of master and servant or of principal and agent.' " *Dunn v. Caylor,* 218 Ga. 256, 258 (127 SE2d 367). Thus, the criterion is whether the daughter was using the lawn mower by the command of or in the prosecution of the (master's)

business. I find that she was.

The word "business" has been given a liberal interpretation. It has *not* been restricted to pursuit of employment for profit. *Griffin v. Russell,* 144 Ga. 275, 278 (87 SE 10); *Standford v. Smith,* 173 Ga. 165, 167 (159 SE 666). For example, the application of the law of master and servant and principal and agent has been applied to the "family car doctrine." *Stewart v. Stephens,* 225 Ga. 185, 186 (166 SE2d 890). The same doctrine also applies to airplanes and boats. Id.; *Kimbell v. DuBose,* 139 Ga. App. 224, 228 (228 SE2d 205). In holding the doctrine applicable to boats, the Supreme Court said "This is not an extension of the family-purpose doctrine to boats, but is simply the application of the rule of master and servant, or principal and agent, to boats as well as automobiles." *Stewart v. Stephens,* 225 Ga. 185, 186, supra. It is evident that the automobile, the boat, the airplane and "the riding lawn mower" in the instant case, all serve a similar "family-purpose." The riding lawn mower is the equivalent of the automobile. It is powered by a gasoline engine, has four wheels, a steering mechanism, a transmission, brake and clutch, forward and reverse gears, and some have lights and electric starters. Thus, just as a child using the family automobile is engaged in the "business" of the parent, a child using a lawn mower for the purpose for which it was purchased and intended, with the express "permission of the parent, express or implied," *(Stewart v. Stephens,* 225 Ga. 185, 186, supra), as in the instant case, is engaged in the "business" of the parent.

I would reverse.