662 S.E.2d 867 (2008)
MIMS
v.
The STATE.
No. A08A0218.
Court of Appeals of Georgia.
June 4, 2008.
*868 Kish & Lietz, Paul S. Kish, A. Keith Logue, Marietta, for appellant.
Peter J. Skandalakis, District Attorney, Kevin T. McMurry, Assistant District Attorney, for appellee.
ANDREWS, Judge.
Keith Gary Mims was convicted by a jury of contributing to the delinquency of a minor (N.K.), sexual battery (N.K.), cruelty to children (L.P.), and rape (L.P.). He appeals from the judgment entered on his convictions, sentencing him to serve 25 years in prison and the remainder of his life on probation.[1]
On appeal from a criminal conviction, we view the evidence in a light favorable to the verdict, and Mims no longer enjoys a presumption of innocence. See McGee v. State, 287 Ga.App. 460, 651 S.E.2d 546 (2007). We neither weigh the evidence nor resolve issues of witness credibility, but determine only whether the evidence was sufficient to allow a rational trier of fact to find the accused guilty beyond a reasonable doubt. See id.
So viewed, the evidence was that N.K., who was 16 years old in December 2006, was friends with L.P., who was 17 years old. *869 N.K. attended Trinity Fellowship, a church in Peachtree City, where Mims and his wife were youth leaders, assisting the youth pastor with church activities. N.K. invited L.P. to attend the youth group with her and L.P. had attended two or three times, including going to Mims' house with other young people when Mims and his wife were both present. Prior to December 19, 2006, N.K. had discussed with Mims her desire to drink alcoholic beverages and Mims had told her that she and L.P. were welcome to drink at his house and he would be there with them.
On December 19, N.K. went to dinner with L.P. and L.P.'s family. After dinner, N.K. received a cell phone call from Mims and they chatted. Mims could hear L.P. in the background commenting on her need for a stress reliever and he told N.K. that they could come over to his house and drink. Having told their respective families that they were spending the night with each other, N.K. and L.P. drove to Mims' house around 10:00 p.m. that evening. L.P. and N.K. were expecting Mrs. Mims to also be there, but found only Mims when they arrived. Mims told them that his wife and children were visiting family in Canada. Mims and the two young women got into his car and he drove to the liquor store where he purchased a large bottle of vodka. They returned to Mims' home where they began to consume the vodka in shot glasses, flavored with snow cone syrup.
L.P. and N.K. each consumed at least three or four shots of the vodka, along with Mims. L.P. threw up from the effects of the vodka, but Mims encouraged her to have another shot and said that it would be okay. She had the shot and threw up again. At this point, they decided to go and get some movies and Mims drove them to Blockbuster where L.P. and N.K. went in and picked out three movies. Although Mims initially went into the store with them, he left and went to purchase wine coolers. Upon returning to Mims' house, they continued to drink and L.P. had several wine coolers. Because of a problem with Mims' DVD player, Mims drove L.P. and N.K. to L.P.'s house where the two young women snuck into L.P.'s bedroom and got her DVD player to take back to Mims' home. After watching movies for a while, N.K. got sleepy and Mims walked her into his daughter's bedroom. After N.K. lay down, she felt Mims' arm around her and Mims said he wanted to kiss her. Mims got his hand under her top and touched her on her breasts. Mims then attempted to place his hands in N.K.'s pants, but she continued moving around until he left.
L.P. had gone to sleep on the couch and awoke briefly to see Mims taking N.K. into the bedroom. Later, L.P. awoke to find Mims kissing her and lying on top of her. L.P. felt a lot of pain in her vaginal area because Mims had inserted his penis into her. L.P. slipped in and out of consciousness and was really scared. Somehow, she got up the strength and got off the couch. She pulled up her pants and went into the bedroom where N.K. was. She lay down next to N.K. and Mims came and knelt next to the bed and was rubbing her back. L.P. told N.K. to get Mims away from her and N.K. told him that L.P. was tired and needed to go to sleep. Mims left the room and L.P. told N.K. that Mims had raped her. N.K. sent L.P. to L.P.'s car and went to retrieve their cell phones. As N.K. left the house, she saw Mims asleep on the couch. N.K. then drove to a church parking lot where L.P. called her brother. While they were there, a sheriff's car drove up and spotlighted the car around 3:30 a.m. N.K. got out of the car and talked to the deputies. L.P. told them she had been raped and the officers escorted them to the hospital where L.P. was examined. L.P., who was crying and shaking, told the deputies that she did not consent to sex, but said she did not tell him to stop either.
Dr. Hall-Moore examined L.P. and took samples for the rape kit. L.P. told Dr. Hall-Moore that she had been sexually assaulted by her friend's youth pastor. Upon physical examination, Dr. Hall-Moore found edema over L.P.'s urethra and hymen. Blood was found in L.P.'s blue jeans.
While N.K. was at the hospital with L.P., Mims attempted to call her on her cell phone. At 4:58 a.m., L.P. received this text message from Mims: "Ok?" A minute later, this message was texted to L.P.: "Im lookin 4 u. u ok?"
*870 Blood was drawn from L.P. at 8:28 a.m. and at that time her blood alcohol was 0.043. A Georgia Bureau of Investigation (GBI) forensic toxicologist stated that, in her expert opinion, at the time of the assault, L.P.'s blood alcohol would have been 0.17.
Although L.P. took the morning after pill at the hospital, she became pregnant and underwent an abortion on February 14, 2007. Investigator Ables was at the medical facility and collected the aborted fetal material.
While L.P. was being examined at the hospital, Capt. Grant went to Mims' residence to secure the premises while a search warrant was being obtained. Capt. Grant knocked on the door for ten to twenty minutes before Mims opened the door. Capt. Grant advised Mims of his rights after Mims asked what the visit was about. Mims acknowledged that L.P. and N.K. had been to his home, but said they only stayed about thirty minutes and then left. Mims denied having touched either young woman or having sex with either one. After saying the young women were only there 30 minutes, Mims said that the three of them watched movies. After obtaining the search warrant, officers found the following items: a shot glass, three DVDs, a Blockbuster receipt time stamped 11:41 p.m., four bottles of Bacardi Silver wine coolers pushed to the very back under the sink in the kitchen, and a two-thirds empty 1.75 liter bottle of Seagrams Citrus vodka in the refrigerator.
Mims was interviewed again that day by Investigator Ables, who also advised him of his rights. Mims again denied that any sexual contact had occurred. Lt. Lewis also interviewed Mims later that day when he took mucal swabs from him for DNA comparison. Mims also denied sexual contact in this interview.
The DNA swabs taken from Mims' mouth were compared to the rape kit as well as the fetal material by a GBI forensic biologist. According to the biologist, Mims' DNA was found in the rape kit and it was 99.9969 probability that Mims was the father of the aborted child.
1. Mims' first enumeration is that the trial court abused its discretion by allowing the State to introduce evidence of L.P.'s pregnancy and subsequent abortion when Mims offered to stipulate that he had sex and thereby eliminate the need for proof of comparisons between his DNA and the fetal tissue, especially when the earlier DNA comparison would not have required proof of the pregnancy and abortion.
Mims relies primarily on Ross v. State, 279 Ga. 365, 614 S.E.2d 31 (2005), for his argument. There, Ross was charged with possession of a firearm by a convicted felon. He offered to stipulate his status as a convicted felon and the name and nature of his prior conviction, enticing a minor for indecent purposes, in order to prevent the jury from viewing the particularly prejudicial nature of his prior conviction. The State refused and the trial court allowed into evidence the indictment for that prior conviction.
In Ross v. State, supra at 367(2), 614 S.E.2d 31, the Supreme Court reiterated that the law in Georgia
properly prevents a defendant from admitting certain crucial facts related to the crime, such as the cause of the victim's death, in order to prevent the admission of evidence tending to prove that fact. A defendant cannot undermine the credibility of the State's story by selectively admitting certain incriminating evidence to prevent the jury from receiving that evidence.
(Footnote omitted.)
Adopting the reasoning set out in Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), however, the Supreme Court concluded that in the unique case of an offense based on an accused's status as a person convicted of a prior unrelated crime,
[t]he need to allow the State to choose its evidence to tell a continuous story is inapplicable here because "[p]roving status without telling exactly why that status was imposed leaves no gap in the story of a defendant's subsequent [and currently relevant] criminality. . . ." Thus, in this situation, "there is no cognizable difference between the evidentiary significance of an admission and of the legitimately probative *871 component of the official record the [State] would prefer to place in evidence."
(Punctuation and footnotes omitted.) Ross v. State, supra at 367(2), 614 S.E.2d 31.[2]
Although Mims also relied on Wilson v. State, 9 Ga.App. 274, 70 S.E. 1128 (1911), in which the victim's pregnancy was found irrelevant to the case against Wilson for assault with intent to rape and his defense of insanity, the pregnancy at issue there, as pointed out by the State and acknowledged by Mims here, was not caused by the assault but was a preexisting pregnancy.
Mims cites no case, and we are aware of none, which extends the rule of Ross v. State, supra, to any crime beyond possession of a firearm by a convicted felon. See Curry v. State, 283 Ga. 99, 100-101(2), 657 S.E.2d 218 (2008); Whitt v. State, 281 Ga.App. 3, 635 S.E.2d 270 (2006).
Here, Mims denied three times that he had any sexual contact with L.P. or N.K., making the DNA matches relevant. That one match was made from fetal material resulting from Mims' assault, while prejudicial, was also relevant. See Scott v. State, 250 Ga. 195, 199(2), 297 S.E.2d 18 (1982) (murder weapon and photograph of deceased admissible despite defendant's offer to stipulate as to the cause of death); Johnson v. State, 226 Ga. 511, 512(2), 175 S.E.2d 840 (1970) (post mortem pictures of victim not excluded even if defendant offered to stipulate everything the pictures would show); Mills v. State, 273 Ga.App. 699, 701(2), 615 S.E.2d 824 (2005) (evidence of defendant's probationary status, even though reflecting negatively on Mills' character, relevant to motive for fleeing from officer).
Therefore, this enumeration is without merit.
2. In his second enumeration, Mims contends that the trial court's denial of his motion to redact numerous comments of Lt. Lewis made during his interview with Mims was error.[3]
First, we note that, during the argument on Mims' motion, defense counsel was asked by the court if he had attempted to have the video recording redacted so as to remove the portions he found objectionable. Trial counsel responded, "I have not. There real frankly is no way to do that. There is back and forth." Further, when the redacted video, State's Exhibit 67, was introduced into evidence prior to being played for the jury, defense counsel was asked if he had objection and stated, "[n]o sir."
Pretermitting the issues of whether any objection was waived and whether admission of the enumerated statements of Lt. Lewis was error, we conclude that, given the overwhelming evidence of Mims' guilt and the context of the evidence as a whole, it is highly probable that Lt. Lewis' remarks did not contribute to the verdict. See Shelton v. State, 251 Ga.App. 34, 38(3), 553 S.E.2d 358 (2001).
3. Mims' third enumeration is that the trial court erred in allowing into evidence L.P.'s testimony that, following these events, she suffered nightmares and had to sleep with her parents.
As noted by the trial court during the discussion of Mims' objection to this testimony, Mims was charged with cruelty to children, which requires the State to prove that he "maliciously cause[d] a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70(b).
L.P. testified that, prior to December 20, 2006, she did not have nightmares and was not afraid to be alone. Following the events of that night, however, she began to have nightmares and began to sleep in her parents' bedroom. This evidence was admissible to prove that Mims' acts caused her mental *872 pain. See Keith v. State, 279 Ga.App. 819, 822(3), 632 S.E.2d 669 (2006).
4. Finally, Mims argues that the trial court erred in not giving his request to Charge #18.
That request was to charge that "[i]f the influence of alcohol impairs a person's mind to the extent that the person is not able to form the intent to commit the act with which he/she is charged, that person would not be criminally responsible for the act. Whether that is true is a question for you, the jury, to decide." This language is found in Suggested Pattern Jury Instructions, Vol. II (Fourth Edition) § 3.60.40, entitled "Intoxication, Voluntary; Insanity Resulting from Excessive, Continued Use of Alcohol."
There was no defense of insanity due to alcohol consumption raised by Mims and the only evidence was of a temporary condition. The trial court correctly ruled the charge inapplicable. Scott v. State, 275 Ga. 305, 307(4), 565 S.E.2d 810 (2002).
Judgment affirmed.
RUFFIN, P.J., and BERNES, J., concur.
NOTES
[1] That sentence was entered on the rape conviction and the sentences on the other three counts are concurrent with that sentence.
[2] It should be noted that, although error in refusing the stipulation was found in Ross, it was ruled harmless. See also Curry v. State, 283 Ga. 99, 100-101(2), 657 S.E.2d 218 (2008) (possession of a firearm by a convicted felon); Whitt v. State, 281 Ga.App. 3, 635 S.E.2d 270 (2006) (same).
[3] The trial court did order redacted from the interview the following statements of Lt. Lewis: "You're so full of crap." "That's not the truth. I get lied to every day, and I know when I'm [being] lied to." "It doesn't look good for you, tell you that."